| | | |
|---|---|---|
| GOVERNOR GREG ABBOTT, in his official capacity as Governor of the State of Texas, *Plaintiff,* v. JOSEPH R. BIDEN, in his official capacity as President of the United States; DEPARTMENT OF DEFENSE; LLOYD AUSTIN, in his official capacity as Secretary of the Defense; DEPARTMENT OF THE AIR FORCE; FRANK KENDALL III, in his official capacity as Secretary of the Air Force; DEPARTMENT OF THE ARMY; and CHRISTINE WORMUTH, in her official capacity as Secretary of the Army, *Defendants.* | | No. 6:22-cv-3 |

## PLAINTIFF'S ORIGINAL COMPLAINT

### I.    INTRODUCTION

1.    There has long been a clear and distinct line between when National Guardsmen are governed by state authority and when they are governed by federal authority. When National Guardsmen are serving the State, the federal government has no command authority. Neither the President nor federal military officials can order the Governor of Texas and state officials how to govern the Guardsmen under their command. Under the Constitution's carefully crafted balance between federal and state sovereignty, only the State, through its Governor, possesses legal authority to govern state National Guard personnel who have not been lawfully federalized.

2.     Defendants unilaterally severed the division between state and federal authority over the Army National Guard and Air National Guard by attempting to impose a mandatory COVID-19 vaccine policy ("Military Vaccine Mandate") on Guardsmen under state control, and in violation of Texas state law. Rather than exercise their own authority and lawfully activate the President's chain of command, Defendants have attempted to force state officers to do the work for them, in violation of both the U.S. Constitution and federal laws.

3.     This is not a case demanding a position of pro- or anti-vaccine, nor is it a case that challenges any aspect of the federal government's authority over National Guardsmen once that federal authority has been properly established. Instead, this case seeks protection from the federal government's unconstitutional action to force Texas, through its Governor, to submit to federal orders and impose federally dictated disciplinary action on its National Guardsmen. "There is no military exclusion from our Constitution." *U.S. Navy Seals 1-26 v. Biden*, No. 4:21-cv-01236, slip op. at 2 (N.D. Tex. Jan. 3, 2021). Therefore, Plaintiff Greg Abbott, in his official capacity as Governor of the State of Texas, and as Commander in Chief of the Texas National Guard, brings this suit to enforce rights guaranteed to the Governor and the State of Texas by the U.S. Constitution and federal statutes.

## II.     PARTIES

4.     Plaintiff Greg Abbott is the Governor of the State of Texas. He is the Commander in Chief of Texas's military forces, including the Texas National Guard.

5.     Defendant Joseph R. Biden is the President of the United States. President Biden is sued in his official capacity.

6.      Defendant Department of Defense is charged with coordinating the United States' Armed Forces.

7.      Defendant Lloyd Austin is the Secretary of Defense. He is sued in his official capacity.

8.      Defendant Department of the Air Force is one of three military departments within the Department of Defense. The Texas Air National Guard is a reserve component of the Air Force.

9.      Defendant Frank Kendall III is the Secretary of the Air Force. He is sued in his official capacity.

10.     Defendant Department of the Army is one of three military departments within the Department of Defense. The Texas Army National Guard is a reserve component of the Army.

11.     Defendant Christine Wormuth is the Secretary of the Army. She is sued in her official capacity.

### III.     JURISDICTION AND VENUE

12.     This Court has jurisdiction under 5 U.S.C. §§ 702–703 and 28 U.S.C. §§ 1331, 1346, and 1361.

13.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

14.     Venue is proper within this District pursuant to 28 U.S.C. § 1391(e)(1) because (A) Plaintiff resides in Texas and no real property is involved and (B) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

### IV.     LEGAL BACKGROUND

15.     There is a clear division of authority between the State and the federal government when it comes to command and governance of the Texas National Guard. Defendants' attempted

usurpation of state-level control and governance of non-federalized Guardsmen ignores this division, exceeds Defendants' constitutional and statutory authority, and subverts the State's authority over its state military forces.

### A. Dual Sovereignty Over the Militia

16.     The Constitution establishes a system of "dual sovereignty." *Gregory v. Ashcroft,* 501 U.S. 452, 457 (1991). Although the States surrendered many of their powers to the federal government, they retained "a residuary and inviolable sovereignty." The Federalist No. 39, at 245 (J. Madison). This is expressly recognized in the Tenth Amendment to the Constitution: the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

17.     Article II, Section 2 of the U.S. Constitution, the Commander-in-Chief Clause, states that "[t]he President shall be Commander in Chief of the Army and Navy of the United States, *and of the Militia of the several States,* **when called** into the **actual Service** *of the United States.*" (emphasis added).

18.     Likewise, Article I, Section 8, Clause 16 of the U.S. Constitution, commonly known as the Second Militia Clause, authorizes Congress "[t]o provide for organizing, arming, and disciplining the Militia, *and for* **governing** *such Part of them as may be* **employed in the Service of the United States,** reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." (emphasis added).

19.     At the time of the Constitution's drafting and adoption, "disciplining" in the Second Militia Clause referred to training, whereas "governance" referred to administrative enforcement and punishment. Benjamin Daus, *The Militia Clauses and the Original War Powers*, 11 J. of Nat'l

Security Law & Policy 489, 508–09 (2021). The President's authority to "govern" the National Guard is limited to those times that they are "employed in the Service of the United States" — that is, they must be "federalized," or put into Title 10 status. Yet "governance" is exactly what the President and his officials here purport to do.

20.     The federal government's power over the militia is thus a concurrent, and not an exclusive, power. All powers over the militia that previously existed in the states and are not expressly delegated to the United States are reserved for the states.

### B.     State Authority Over the National Guard

21.     The "militia" referred to in the U.S. Constitution is now known as the National Guard. "National Guard" collectively refers to each individual State's militia as well as the National Guard of the United States (NGUS). NGUS, which comprises the Army National Guard of the United States and the Air National Guard of the United States, is a reserve component of the respective federal military departments.

22.     The Supreme Court has described the distinction between NGUS and a state National Guard as follows:

> Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States. In the latter capacity they became a part of the Enlisted Reserve Corps of the Army, but unless and until ordered to active duty in the Army, they retained their status as members of a separate State Guard unit.

*Perpich v. Dep't of Defense*, 496 U.S. 334, 345 (1990). Texas National Guardsmen thus serve in both the Texas Army National Guard or Texas Air National Guard and the corresponding component of NGUS.

23.     Referring to the "employed in the service of" aspect of the Second Militia Clause, the Supreme Court has also observed that "[t]he Governor . . . remain[s] in charge of the National

Guard in each State except when the Guard [i]s called into active federal service." *Maryland ex rel. Levin v. United States*, 381 U.S. 41, 47 (1965).

24.     Every member of the Texas National Guard swears an oath to "obey the orders of the President . . . and of the Governor." 32 U.S.C. §§ 304, 312; *see also Perpich*, 496 U.S. at 348 (noting various "hats" worn by guardsmen).

25.     However, given the constitutional limitation on the President's authority to only those armed forces "in actual Service of the United States," the authority to command those forces outside of "actual Service of the United States" resides with the State of Texas's Commander in Chief—the Governor of Texas.

26.     The Texas Constitution sets this out explicitly: "[The governor] shall be Commander in Chief of the military forces of the State, except when they are called into actual service of the United States." Tex. Const. art. IV, § 7; *see also* Tex. Gov't Code § 437.002(a) ("The governor is the commander in chief of the Texas military forces, except any portion of those forces in the service of the United States," and he "has full control and authority over all matters relating to the Texas military forces, including organization, equipment, and discipline.").

27.     This solitary governance by the States over National Guardsmen occurs whenever the Guardsmen are not in the active duty of the United States, known as Title 10 status.

28.     "Within a state, that state's governor is the key decision maker and commands the state's National Guard forces when they are not in federal Title 10, USC, status." Joint Chiefs of Staff, Joint Publication 3-0: Joint Operations, at VII-6 (Jan. 17, 2017), available at https://www.jcs.mil/Portals/36/Documents/Doctrine/pubs/jp3_0ch1.pdf.

29.     In his capacity as Commander in Chief, "[t]he governor shall make and publish regulations, according to existing federal and state law, to govern" the Texas National Guard. Tex. Gov't Code § 437.004(a). Those regulations "must address general orders and forms for the performance of service members on military duty, including provisions governing courts-martial." *Id.* The Governor may also reorganize and provide regulations relating to any portion of the Texas National Guard. *Id.* § 437.004(b).

30.     Unlike some other states, Texas has not generally adopted federal law and regulations related to the control, administration, or governance of the National Guard, except in two specific circumstances: enlistment and appointment qualifications, *see id.* § 437.007(a), and regulations governing discharge, *see id.* § 437.225.

### C.     Title 10, Title 32, and State Active Duty Status

31.     National Guardsmen serve either in full-time federal service under federal command (pursuant to Title 10 of the U.S. Code); full or part-time National Guard duty that is federally funded but under state command (pursuant to Title 32 of the U.S. Code); or state active duty status, which is state-funded and under exclusive state command.

#### 1.     Federal Active Duty or "Title 10" Status

32.     Title 10 of the United States Code dictates when the President or the Secretary of Defense is permitted to "federalize" the National Guard forces. This federalization of members of the National Guard status is commonly known as "Title 10 status."

33.     When the President federalizes a state National Guard unit or service member, governance authority must be transferred in a precise manner, ensuring there is neither confusion nor

ambiguity as to when the command authority shifts, and leaving no doubt as to whether a particular Guard member is under state or federal control.

34.     Guardsmen are federalized and considered in "actual service of the United States" when a federal order is published stating the legal authority for the order and its duration. *See also, e.g.*, 32 U.S.C.A. § 325; 10 U.S.C.A. § 12301; *Perpich*, 496 U.S. at 343-44. The President becomes the Commander in Chief of a federalized National Guard, and those federalized Guardsmen are subject to the authority of the federal government, including the Uniform Code of Military Justice, only once that Title 10 order is issued.

35.     The Governor's retains authority over Texas's Guardsmen unless and until they are called into the "actual service" of the United States by being moved into Title 10 status.

### 2.     State-Controlled, Federally Funded "Title 32" Status

36.     A guardsman who is under state command but whose position is federally funded is serving in "Title 32 status." That status is authorized by the First Militia Clause, which authorizes federal use of the National Guard while under continuing state control to "execute the Laws of the Union, suppress insurrections and repel Invasions." U.S. Const. art. I, § 8.

37.     National Guardsmen who are in "Title 32 status" are not in "actual Service" of the United States. Title 32 dictates that this actual service only occurs once the Guardsmen are "ordered to active Federal duty." 32 U.S.C. § 102.

38.     The Governor is the sole commander in chief of a National Guardsmen on Title 32 status.

39.     National Guardsmen serving under Title 32 are subject to state military codes and not the Uniform Code of Military Justice (UCMJ). Nor does the President serve as their Commander in Chief; that responsibility is solely the Governor's. *See Perpich*, 496 U.S. at 343–44.

### 3. State Active Duty Status

40. A Texas National Guardsman can be assigned to state active duty status by the Governor. *See, e.g.*, Tex. Gov't Code § 437.005(a).

41. State laws dictate when state authorities may call upon their National Guards. Texas law provides broad authority for the use of militias to quell domestic disturbances or assist in disaster relief when local and state government civil resources have been exhausted. *See* Tex. Gov't Code § 437.001 *et seq.*

42. Guardsmen in state active duty status are not in "actual Service" of the United States, but rather perform their duties under the command and control of the Governor. National Guardsmen in this status are state funded. *See* Tex. Gov't Code § 437.212(a).

## D. Limited Federal Authority

43. The federal government's authority over a state's National Guard and individual Guardsmen when not in the "actual Service" of the United States is severely constrained.

44. The President "shall prescribe regulations, and issue orders necessary to organize, discipline, and govern the National Guard." 32 U.S.C. § 110. This statutory grant of authority mirrors the authority granted to Congress in the Second Militia Clause. But Title 32 itself recognizes that states cannot be forced to comply with federal requirements or regulations and, instead, provides the federal government certain remedies if a state chooses not to comply. *See, e.g.*, 32 U.S.C. § 108 (forfeiture of federal benefits).

45. By statute, the federal government may also, in accordance with applicable laws and regulations, withdraw federal recognition of national guard units and officers of the National Guard through the National Guard Bureau. *See* 10 U.S.C. § 10503. As to individual guardsmen, the

federal government may withdraw federal recognition if a member ceases to have the qualifications prescribed by the Secretary of the Army or Air Force, as applicable. 32 U.S.C. § 323(a).

46.     The respective Secretary may conduct inspections to determine whether guardsmen meet physical and other qualifications, but members are not normally discharged due to failed inspections. *See* 32 U.S.C. § 105. The state commanders conduct discharges per federal regulations.

## V.     FACTUAL BACKGROUND

47.     Against this legal framework, Defendants have attempted to extend their reach beyond what the U.S. Constitution (and federal law) allow and usurp the authority reserved to the states. These efforts will bring acute and irreparable harm to the Governor of Texas as Commander in Chief, the State of Texas, and its citizens.

48.     Prior to Defendants' attempt to apply the Military Vaccine Mandate on non-federalized Guardsmen, Texas, through Governor Abbott's command, has ensured that its troops meet military readiness standards without compulsion, threat, or micromanagement from Defendants. For over eighteen months since the beginning of the COVID-19 pandemic, federal officials have not attempted to dictate or control disciplinary actions for vaccine compliance by non-federalized Guardsmen.

49.     On August 24, 2021, Secretary of Defense Austin issued a memorandum to his senior military leadership. **Exhibit 1** at 1. With "full support of the President," Secretary Austin dictated that he believed the federal government had complete authority to compel all military members to participate in "mandatory vaccination against coronavirus disease 2019 (COVID-19)." *Id*. Consequently, the Secretary directed the Military Departments, to necessarily include state

governors as commanders in chief to Title 32 Guardsmen, to "immediately begin full vaccination of all members of the Armed Forces under DoD authority on active duty or in the Ready Reserve, *including the National Guard*, who are not fully vaccinated against COVID-19." *Id.* (emphasis added). The Secretary concluded by calling for "ambitious timelines for implementation" of the vaccination mandate and demanding that Military Departments "report regularly on vaccination completion using established systems for other mandatory vaccine reporting." *Id.* at 2.

50.     On October 4, 2021, Governor Abbott sent a letter to Major General Tracy Norris, the Adjutant General of the Texas Military Department. **Exhibit 2** at 1. Pursuant to his authority as Commander in Chief, Governor Abbott made clear that Executive Order No. GA-39—commanding that "[n]o governmental entity can compel any individual to receive a COVID-19 vaccine"—including the Texas National Guard.  *Id.*; **Exhibit 3** at 3.

51.     On November 30, 2021, Secretary Austin issued an additional memorandum regarding vaccination of military servicemembers. This memorandum was particularly aimed at "members of the *non-federalized* National Guard who remain unvaccinated." **Exhibit 4** at 1 (emphasis added). Specifically, the Secretary ordered the "Secretary of the Army and the Secretary of the Air Force, in coordination with the Under Secretary of Defense for Personnel and Readiness and the Chief of the National Guard Bureau" to exercise authority over these non-federalized members in the form of:

- subjecting them to deadlines by which to be vaccinated if they wanted to continue "to participate in drills, training and other duty conducted under title 32, U.S. Code";

- withholding Department of Defense funding from non-federalized Guard members for "payment of duties performed under title 32" if they declined the COVID-19 vaccine; and

- depriving them of credit or excused absences if members, while unvaccinated, participated, or were prohibited from participating, "in drills, training or other duties."

*Id.* No general legal authority or mechanism exists in which the Secretaries or any other agent of the federal government may withhold payment, service credits, and recognition for duties performed from individual servicemembers. Nonetheless, the Secretary's memorandum emphasized that the policies he ordered were to be similarly issued by each state's commanders in chief "with respect to members of the non-federalized National Guard." *Id.* He closed with the demand that "[t]he policies and implementation guidance directed by this memorandum shall be published no later than December 6, 2021." *Id.*

52.     Implementation of the Military Vaccine Mandate as to non-federalized Guard members soon followed in the form of directives and orders from the Secretaries of the Air Force and Army.

53.     On December 7, 2021, Secretary of the Air Force Frank Kendall issued a memorandum regarding members of the Air Force, Space Force, Air Force Reserve, and Air National Guard. **Exhibit 5** at 1. Secretary Kendall declared "[v]accination against COVID-19 is an essential military readiness requirement for all components of the Air Force," which purportedly enables him to exercise authority over all personnel, including those in Title 32 status. *Id.*

54.     The December 7th memo stated that refusal to comply with the Military Vaccine Mandate without an exemption "will result in the member being subject to the initiation of administrative discharge proceedings." *Id.* Service members separated due to the refusal of the COVID-19 vaccine will not be eligible for involuntary separation pay and will be subject to recoupment of any unearned special or incentive pays. *Id.*

55.    In Attachment 2 to his memorandum, Secretary Kendall set out "supplementary guidance" for Air National Guard (ANG) members under Title 32 status. *Id.* at 5. Despite the term "guidance," Secretary Kendall declared compliance with the orders therein "mandatory." *Id.*

56.    Attachment 2 states that, in accordance with 32 U.S.C. § 328, Secretary Kendall "hereby withdraws consent for members not fully vaccinated to be placed on or to continue on previously issued Title 32 Active Guard and Reserve (AGR) orders." *Id.*

57.    Attachment 2 ordered ANG members under Title 32 status to be classified no later than December 31, 2021 based on their COVID-19 vaccine status. *Id.* It further ordered that ANG members under Title 32 "that have not initiated a vaccination regimen by December 2021 may not participate in drills, training, or other duty conducted under Title 10 or Title 32 U.S.C." *Id.* For "those with a remaining Military Service Obligation" Secretary Kendall demanded they be "involuntarily assigned to the Individual Ready Reserve (IRR) in accordance with 10 U.S.C. § 651 and DoDI 1235.13." *Id.* Secretary Kendall further threatened ANG members under Title 32 status that they would "be subject to recoupment for any unearned special, incentive pays or certain training." *Id.* at 6.

58.    In response to the order from the Secretary of the Defense, the Army issued an order on September 14, 2021, requiring every soldier not otherwise exempt to be vaccinated against COVID-19. This order included the Army National Guard. Failure to be vaccinated could result in adverse action including discharge.

59.    A subsequent order was issued by the Army on December 14, 2021, that clarified that guardsmen in Title 32 status were subject to the COVID-19 vaccination requirement and that the completion goal date was June 30, 2022. The directive also stated that beginning on July 1, 2022,

unless otherwise exempt, members of the Army National Guard in Title 32 status who were not vaccinated would not be permitted to participate in drills, training, or other duty, and would not receive any credit or excused absence for failure to participate due to non-vaccination. Also effective July 1, 2022, no payment would be allocated for payment of duties for guardsmen who did not comply with the COVID-19 vaccination requirement.

60.     The Military Vaccine Mandate requires that the Governor, through his Title 32 commanders, undertake specified governance and policy enforcement actions. Defendants' intrusion into the discretion and scope of Title 32 commanders is contrary to the balance of power between federal and state officials set out by the U.S. Constitution and federal law.

61.     Application of the Military Vaccine Mandate to Title 32 Guardsmen, and the harm arising from Defendants' implementation actions, on the State of Texas and Governor Abbott's authority and role as commander in chief will be severe and multi-faceted.

62.     State sovereignty lies at the heart of the constitutional and statutory grant of Governor Abbott's authority over the Texas Air and Army National Guard. The Military Vaccine Mandate is an affront to state sovereignty in that it impermissibly overrides the Governor's statutory grant of "mak[ing]" regulations "to govern the Texas military forces" as well as his grant under the Texas Constitution of the powers of "Commander in Chief of the military forces of the State, except when they are called into actual service of the United States." Tex. Gov't Code § 437.004(a); Tex. Const. Art. IV, §7.

63.     Further, the Military Vaccine Mandate will serve to eliminate a substantial number of Air and Army National Guardsmen from the State's military forces. Guardsmen who refuse to obtain the COVID-19 vaccine will be prohibited from participating "in drills, training or other duties."

**Exhibit 5** at 5. Whether they participate or not, the Military Vaccine Mandate will cause the withholding of the Guardsmen's pay—or subject them to recoupment—and deny them any service credit for participation while unvaccinated. With this loss of pay and credit, Guardsmen may either take any available options to resign, or, ultimately, be administratively discharged.

64.     There are over 220 members of the Texas Air National Guard under the Governor's command who are currently refusing to receive the COVID-19 vaccination for either religious accommodation needs or otherwise.

65.     Approximately 40% of the members of the Texas Army National Guard under the Governor's command are currently refusing to receive the COVID-19 vaccination for either religious accommodation needs or otherwise.

66.     There are no Texas Air National Guardsmen who are currently exempted from the Military Vaccine Mandate.[1]

67.     Because the Military Vaccine Mandate will lead to the loss of these Guardsmen from Governor Abbott's command, and the State's militia, the harm to the State is inevitable. Texas Guardsmen are a critical resource in maintaining the well-being and safety of the citizens of the State of Texas. Texas will be significantly deprived of the military support it needs to protect itself from the challenges that Texans routinely face.

68.     In the event of a natural disaster, such as Hurricane Harvey where Governor Abbott mobilized almost 18,000 Guardsmen, or the unprecedented winter storm in February 2021, the

---

[1] Although the Military Vaccine Mandate purports to contemplate the ability to seek a religious exemption from obtaining a COVID-19 vaccine, concurrent litigation on this score indicates that "by all accounts, it is theater" because no exemptions are provided. *Navy Seals 1-26*, slip op. at *1. Defendants' refusal to grant legitimate religious exemptions is intolerable, and contrary to the First Amendment.

Texas National Guard is frequently called upon by Governor Abbott to provide emergency services, search and rescue, medical care, evacuation efforts, assistance with local shelter, and logistical operations in the affected counties.

69.     The Texas National Guard also plays a key role in border security, ensuring the safety of Texas's citizens after the federal government's refusal to enforce federal immigration laws.

70.     Most notably, the Texas National Guard was mobilized soon after the pandemic began to assist the State's citizens in obtaining basic needs they were lacking. Guardsmen built hospitals, gathered and distributed medical supplies, assisted food bank operations, and provided other relief that lessened the economic and personal impact of COVID-19 on the State. In other words, the Guardsmen whose bravery and selflessness helped maintain and restore the State during the worst of the pandemic are now being forced to leave the service by Defendants for the servicemembers' decision to decline the COVID-19 vaccine.

71.     The harm from the reduction in force caused by Defendants' illegal Military Vaccine Mandate will be reflected in immeasurable ways, borne by future citizens who could have otherwise received the emergency relief they needed, but did not, and causing fundamental changes to the State without secure borders.

72.     Regardless of whether the Guardsmen are permitted to remain on state active duty service, the Military Vaccine Mandate and mandatory enforcement orders puts the State at risk of losing federal funding for noncompliance. This financial impact to the State as a result of the Military Vaccine Mandate will cause significant, irreparable harm.

73.     Defendants' actions directly infringe on Governor Abbott's authority as Commander in Chief and on Texas's sovereignty, and so harm Governor Abbott and Texas. Under Title 32, it is

up to Governor Abbott to determine how to best govern his Guardsmen and meet the demands of Texas while also complying with federal law. It is unlawful for Defendants to attempt to override the Governor's authority to govern his troops, and then leave him to deal with the harms that they leave in their wake.

74.     Additionally, the Defendants seek to commandeer Title 32 personnel, who answer to the Governor of Texas as their Commander in Chief, to become enforcers of the Military Vaccine Mandate, notwithstanding that to do so will violate state law and a direct order from Governor Abbott.

75.     This case is not about any individual's views on COVID-19 vaccines, which are an essential tool in combatting the pandemic. Rather, this case is about the federal government's unlawful encroachment on state sovereignty and authority—on the decisions of the State's Commander in Chief on how to best manage one of Texas's most valuable resources for public safety and emergency response. Defendants simply cannot hijack Governor Abbott's chain of command. If they wish to issue orders, they must do so under their own authority and pursuant to the law, not in spite of it.

## VI.     CLAIMS FOR RELIEF

76.     Governor Abbott expressly incorporates the allegations of each paragraph of this Complaint in the following counts. To the extent there is any perceived inconsistency, Governor Abbott expressly pleads each count in the alternative.

### COUNT I
### Ultra Vires Conduct
### Violation of U.S. Const. art. I, § 8; art. II, § 2
### Against all Individual Defendants

77.     Ultra vires review is available to review whether a government official "violated the

Constitution, the statutes under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

80.     The State of Texas, through its Commander in Chief, maintains control of its own Air and Army National Guard, and Governor Abbott commands the Texas Air and Army National Guard unless and until they are called into active federal service.

81.     Because the Governor is the sole Commander in Chief of a non-federalized National Guardsmen, a federal official's ordering, directing, or punishing of such Guardsmen violates the Militia Clauses and the Commander-in-Chief Clause, which allows Defendants to "govern" such forces only while they are "employed in the Service of the United States," and allows the President to act as Commander in Chief of the "Militia" only "when called into the actual Service of the United States." *See also* 32 U.S.C. § 110.

82.     Defendants' orders implementing the Military Vaccine Mandate and dictating specific punishments for non-federalized troops usurp the constitutional authority of Governor Abbott as Commander in Chief over non-federalized Texas National Guardsmen and violates the Militia Clauses.

83.     The Military Vaccine Mandate also contravenes Texas law as promulgated by Governor Abbott, namely Executive Order GA-39, and so would, if implemented by Title 32 commanders, cause them to violate Texas law and disobey an order of their Commander in Chief, Governor Abbott.

84.     Defendants' actions further threaten Texas's power to appoint officers, which is reserved to it by the Second Militia Clause. Defendants have purported to threaten Guardsmen, including officers, with consequences up to and including discharge for failure to comply with the Military Vaccine Mandate—which they must do if they are to abide by Executive Order GA-39. And since Texas's officers are in Title 32 status, they must follow the commands and orders of the Governor—their Commander in Chief.

85.     Defendants' attempts to exercise command over Guardsmen in Title 32 status are unconstitutional, unlawful, and must be set aside.

**COUNT II**
**Ultra Vires Conduct**
**Violation of Tenth Amendment**
**Against all Individual Defendants**

86.     The structure of the U.S. Constitution and the text of the Tenth Amendment protect federalism and state's sovereignty.

87.     The powers not delegated by the Constitution to the federal government are reserved to the states.

88.     Through their orders applying the Military Vaccine Mandate to National Guardsmen under state control, and by requiring officers under state control to take specified disciplinary actions against such Guardsman for violation of federal orders, Defendants attempt to exercise power beyond that delegated to them under the U.S. Constitution.

89.     By interfering with the traditional balance of power between the states and the federal government, Defendants are violating the Tenth Amendment and structural principles of federalism, and their actions are unconstitutional, unlawful, and must be set aside.

## COUNT III
### Administrative Procedure Act
### Arbitrary and Capricious Agency Action, 5 U.S.C. § 706
### Against all Agency Defendants

90.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary

and capricious." *See* 5 U.S.C. § 706 (2)(A). "[A]gency action" is defined as "the whole or a part

of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to

act." *Id.* § 551(13). An agency "rule" is defined as "the whole or a part of an agency statement of

general or particular applicability and future effect designed to implement, interpret, or prescribe

law or policy or describing the organization, procedure, or practice requirements of an agency."

*Id.* § 551(4).

91.    An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation

for its action including a rational connection between the facts found and the choice made." *Motor

Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Military

decisions are not shielded from substantive review under the APA review simply because it is the

military that has acted arbitrarily and capriciously. *See, e.g., Kuang v. U.S. Dep't of Defense*, 778 F.

App'x 418, 420 (9th Cir. 2019).

92.    The Agency Defendants' memoranda and directives, attached as exhibits and described

above, constitute final agency action.

93.    Defendants have not adequately explained their implementation of the Military Vaccine

Mandate as applied to non-federalized Texas Guardsmen in Title 32 status, and their failure to do

so is arbitrary and capricious. The Governor is the Commander in Chief of these forces and is

responsible for the governance of Texas forces unless placed into a federalized Title 10 status.

Defendants have not articulated any basis for interfering with the Governor and his chain of

command, and they have not considered any of the other countervailing interests that would counsel against their unlawful actions.

94.     The stark differences between the implementation of the Military Vaccine Mandate among the branches—the Texas Air National Guard faces imminent and immediate deadlines, whereas the Texas Army National Guard has months to comply—further reflects the lack of a rational connection between the professed goal of troop readiness and the unlawful means of achieving it.

95.     Further, the Agency Defendants' actions evince no consideration of Texas's substantial reliance interests in the Texas National Guard's availability to provide emergency services, search and rescue, medical care, evacuation efforts, assistance with local shelter, and logistical operations.

96.     Defendants' challenged actions are arbitrary and capricious and must be set aside.

## COUNT IV
### Declaratory Judgement
### Against all Defendants

97.     The federal Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The issuance of a declaratory judgment can serve as the basis for an injunction to give effect to the declaratory judgment. *Steffel v. Thompson*, 415 U.S. 452, 461 n. 11 (1974).

98.     For the foregoing reasons, and pursuant to each of the above Counts, Plaintiff is entitled to a declaratory judgment establishing his authority to govern the Texas National Guard while they remain in Title 32 status and, if necessary, an injunction to effectuate that declaratory judgment.

**PRAYER FOR RELIEF**

For these reasons, Governor Abbott prays that the Court:

a.  Declare that the Military Vaccine Mandate and its enforcement against non-federalized Texas National Guardsmen violates the U.S. Constitution and federal law;

b.  Declare that Defendants' actions in imposing and enforcing the Military Vaccine Mandate against non-federalized Texas National Guardsmen are *ultra vires*;

c.  Set aside the Military Vaccine Mandate as applied to non-federalized Texas National Guardsmen;

d.  Preliminarily and permanently enjoin the Defendants, and any other agency or employee of the Unites States, or any individual working in concert with them, from enforcing the Military Vaccine Mandate as to non-federalized Texas National Guardsmen;

e.  Award Texas costs and reasonable attorneys' fees.

f.  Award such other relief as the Court deems equitable and just.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief, General Litigation Division

*/s/ Christopher D. Hilton*
**CHRISTOPHER D. HILTON**
Texas Bar No. 24087727
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
christopher.hilton@oag.texas.gov

***COUNSEL FOR GOVERNOR ABBOTT***