UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

GOVERNOR GREG ABBOTT, in his
official capacity as Governor of the State of
Texas, and

GOVERNOR MIKE DUNLEAVY, in his
official capacity as Governor of the State of
Alaska,
　　　　*Plaintiffs*,

v.

JOSEPH R. BIDEN, in his official capacity
as President of the United States;
DEPARTMENT OF DEFENSE; LLOYD
AUSTIN, in his official capacity as
Secretary of the Defense; DEPARTMENT
OF THE AIR FORCE; FRANK KENDALL
III, in his official capacity as Secretary of
the Air Force; DEPARTMENT OF THE
ARMY; and CHRISTINE WORMUTH, in
her official capacity as Secretary of the
Army,
　　　　*Defendants*.

No. 6:22-cv-00003

FIRST AMENDED COMPLAINT

I. INTRODUCTION

1.　　　There has long been a clear and distinct line between when National Guardsmen are governed by state authority and when they are governed by federal authority. When National Guardsmen are serving the State, the federal government has no command authority. Neither the President nor federal military officials can order the state Governors or state officials how to govern the Guardsmen under their command. Under the Constitution's carefully crafted balance between federal and state sovereignty, only the States, through their Governors, possess legal authority to govern state National Guard personnel who have not been lawfully federalized.

2.      Defendants unilaterally severed the division between state and federal authority over the Army National Guard and Air National Guard by attempting to impose a mandatory COVID-19 vaccine policy on Guardsmen under State command, and in violation of State laws. Rather than exercise their own authority and lawfully activate the President's chain of command, Defendants have attempted to force State officers to do the work for them, in violation of both the U.S. Constitution and federal laws.

3.      This is not a case demanding a position of pro- or anti-vaccine, nor is it a case that challenges any aspect of the federal government's authority over National Guardsmen once that federal authority has been properly established. Instead, this case seeks to have federal action cabined within federal authority, prohibiting the federal government's unconstitutional attempt to force Texas and Alaska, through their Governors, to submit to federal orders and impose federally dictated disciplinary action on their National Guardsmen. "There is no military exclusion from our Constitution." *U.S. Navy Seals 1–26 v. Biden*, No. 4:21-cv-01236, slip op. at 2 (N.D. Tex. Jan. 3, 2021). Therefore, Plaintiff Greg Abbott, in his official capacity as Governor of the State of Texas, and as Commander in Chief of the Texas National Guard, and Plaintiff Mike Dunleavy, in his official capacity as Governor of the State of Alaska, and as Commander in Chief of the Alaska National Guard, bring this suit to enforce rights guaranteed to them and their respective States by the U.S. Constitution and federal statutes.

## II. Parties

4.      Plaintiff Greg Abbott is the Governor of the State of Texas. He is the Commander in Chief of Texas's military forces, including the Texas National Guard.

5.      Plaintiff Mike Dunleavy is the Governor of the State of Alaska. He is the Commander in Chief of Alaska's military forces, including the Alaska National Guard.

6.      Defendant Joseph R. Biden is the President of the United States. President Biden is sued in his official capacity.

---

7.      Defendant Department of Defense is the federal Cabinet agency charged with coordinating the United States' Armed Forces.

8.      Defendant Lloyd Austin is the Secretary of Defense. He is sued in his official capacity.

9.      Defendant Department of the Air Force is one of three military departments within the Department of Defense. The Texas Air National Guard and the Alaska Air National Guard are reserve components of the Air Force.

10.      Defendant Frank Kendall III is the Secretary of the Air Force. He is sued in his official capacity.

11.      Defendant Department of the Army is one of three military departments within the Department of Defense. The Texas Army National Guard and Alaska Army National Guard are reserve components of the Army.

12.      Defendant Christine Wormuth is the Secretary of the Army. She is sued in her official capacity.

13.      Secretary Austin, Secretary Kendall, Secretary Wormuth, and their respective departments—that is, all the Defendants except for President Biden—are the "Agency Defendants."

## III. Jurisdiction and Venue

14.      This Court has jurisdiction under 5 U.S.C. §§ 702–703 and 28 U.S.C. §§ 1331, 1346, and 1361.

15.      The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

16.      This district is a proper venue because "a substantial part of the events or omissions giving rise to the claim occurred" in this District. 28 U.S.C. § 1391(e)(1).

## IV. Legal Background

17.      There is a clear division of authority between the State and the federal governments when it comes to command and governance of the States' national guards. Defendants' attempted

usurpation of control and governance of non-federalized Guardsmen ignores this division, exceeds Defendants' constitutional and statutory authority, and subverts the States' authority over their own military forces.

## A.  Dual Sovereignty Over the Militia

18.     The Constitution establishes a system of "dual sovereignty." *Gregory v. Ashcroft,* 501 U.S. 452, 457 (1991). Although the States surrendered many of their powers to the federal government, they retained "a residuary and inviolable sovereignty." The Federalist No. 39, at 245 (J. Madison). This is expressly recognized in the Tenth Amendment to the Constitution: the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

19.     Article II, Section 2 of the U.S. Constitution, the Commander-in-Chief Clause, states that "[t]he President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States."

20.     Likewise, Article I, Section 8, Clause 16 of the U.S. Constitution, commonly known as the Second Militia Clause, authorizes Congress "[t]o provide for organizing, arming, and disciplining the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.".

21.     At the time of the Constitution's drafting and adoption, "disciplining" in the Second Militia Clause referred to training, whereas "governance" referred to administrative enforcement and punishment. Benjamin Daus, *The Militia Clauses and the Original War Powers*, 11 J. of Natl. Sec. Law & Policy 489, 508–09 (2021). The President's authority to "govern" the National Guard is limited to those times that they are "employed in the Service of the United States"—that is, they must be "federalized," or put into Title 10 status. Yet "governance" is exactly what the President and his officials here purport to do.

22.     The federal government's power over the militia is thus a concurrent, and not an exclusive, power. All powers over the militia that previously existed in the States and are not expressly delegated to the United States are reserved to the States. *See* U.S. Const. amend. X.

## B.  State Authority Over the National Guard

23.     The "militia" referred to in the U.S. Constitution is now known as the National Guard. "National Guard" collectively refers to each individual State's militia as well as the National Guard of the United States (NGUS). NGUS, which comprises the Army National Guard of the United States and the Air National Guard of the United States, is a reserve component of the respective federal military departments.

24.     The Supreme Court has described the distinction between NGUS and a state National Guard as follows:

> Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States. In the latter capacity they became a part of the Enlisted Reserve Corps of the Army, but unless and until ordered to active duty in the Army, they retained their status as members of a separate State Guard unit.

*Perpich v. Dept. of Defense*, 496 U.S. 334, 345 (1990). Texas National Guardsmen thus serve in both the Texas Army National Guard or Texas Air National Guard and the corresponding component of NGUS. The same is true with respect to Alaska National Guardsmen—they serve in both the Alaska Army National Guard or the Alaska Air National Guard and the corresponding component of NGUS.

25.     As the Supreme Court has observed, under the Second Militia Clause, "[t]he Governor . . . remain[s] in charge of the National Guard in each State except when the Guard [i]s called into active federal service." *Maryland ex rel. Levin v. United States*, 381 U.S. 41, 47 (1965).

26.     Every member of the Texas National Guard and the Alaska National Guard swears an oath to "obey the orders of the President . . . and of the Governor." 32 U.S.C. §§ 304, 312; *see also Perpich*, 496 U.S. at 348 (noting various "hats" worn by guardsmen). However, given the

constitutional limitation on the President's authority to only those armed forces "in actual Service of the United States," the authority to command those forces outside of "actual Service of the United States" resides with each State's Governor—Governor Abbott and Governor Dunleavy.

27.     The Texas Constitution sets this out explicitly: "[The governor] shall be Commander in Chief of the military forces of the State, except when they are called into actual service of the United States." Tex. Const. art. IV, § 7; *see also* Tex. Govt. Code § 437.002(a) ("The governor is the commander in chief of the Texas military forces, except any portion of those forces in the service of the United States," and he "has full control and authority over all matters relating to the Texas military forces, including organization, equipment, and discipline.").

28.     Article III, § 19 of the Alaska Constitution similarly sets forth that "[t]he governor is commander-in-chief of the armed forces of the State. He may call out these forces to execute the laws, suppress or prevent insurrection or lawless violence, or repel invasion."

29.     "Within a state, that state's governor is the key decision maker and commands the state's National Guard forces when they are not in federal Title 10, USC, status." Joint Chiefs of Staff, Joint Publication 3-0: Joint Operations, at VII-6 (Jan. 17, 2017), available at https://www.jcs.mil/Portals/36/Documents/Doctrine/pubs/jp3_0ch1.pdf.

30.     In his capacity as Commander in Chief, Governor Abbott "shall make and publish regulations, according to existing federal and state law, to govern" the Texas National Guard. Tex. Govt. Code § 437.004(a). Those regulations "must address general orders and forms for the performance of service members on military duty, including provisions governing courts-martial." *Id.* The Governor may also reorganize and provide regulations relating to any portion of the Texas National Guard. *Id.* § 437.004(b).

31.     Similarly, Governor Dunleavy "as ex officio commander of the militia of the state has command of the Alaska National Guard and the Alaska Naval Militia while they are not in active federal service. The governor may adopt necessary regulations for them." Alaska Stat. § 26.05.060.

32.     Unlike some other states, Texas has not generally adopted federal law and regulations related to the control, administration, or governance of the National Guard, except in two specific circumstances: enlistment and appointment qualifications, *see id.* § 437.007(a), and regulations governing discharge, *see id.* § 437.225.

## C. Title 10, Title 32, and State Active Duty Status

33.     National Guardsmen serve either in full-time federal service under federal command (pursuant to Title 10 of the U.S. Code); full or part-time National Guard duty that is federally funded but under state command (pursuant to Title 32 of the U.S. Code); or state active duty status, which is state-funded and under exclusive state command.

### 1. Federal Active Duty or "Title 10" Status

34.     Title 10 of the United States Code dictates when the President or the Secretary of Defense is permitted to "federalize" the National Guard forces. This federalization of members of the National Guard status is commonly known as "Title 10 status."

35.     When the President federalizes a state National Guard unit or service member, governance authority must be transferred in a precise manner, ensuring there is neither confusion nor ambiguity as to when the command authority shifts, and leaving no doubt as to whether a particular Guard member is under state or federal control.

36.     Guardsmen are federalized and considered in "actual service of the United States" when a federal order is published stating the legal authority for the order and its duration. *See also, e.g.,* 32 U.S.C. § 325; 10 U.S.C. § 12301; *Perpich*, 496 U.S. at 343–44. The President becomes the Commander in Chief of a federalized Guardsmen and Guard units, and those federalized Guardsmen are subject to the authority of the federal government, including the Uniform Code of Military Justice, only once that Title 10 order is issued.

37.     Each State's Governor retains authority over the State's Guardsmen unless and until they are called into the "actual service" of the United States by being moved into Title 10 status.

### 2.   State-Controlled, Federally Funded "Title 32" Status

38.     A Guardsman who is under state command but whose position is federally funded is serving in "Title 32 status."

39.     Those Guardsmen are not in "actual Service" of the United States. Title 32 dictates that this actual service only occurs once the Guardsmen are "ordered to active Federal duty." 32 U.S.C. § 102. Each State's respective Governor is the sole commander in chief of Guardsmen on Title 32 status.

40.     National Guardsmen serving under Title 32 are subject to state military codes and not the UCMJ. The President does not serve as their Commander in Chief; that responsibility is solely the Governor's. *See Perpich*, 496 U.S. at 343–44.

### 3.   State Active Duty Status

41.     A Texas National Guardsman can be assigned to state active duty status by the Governor. Tex. Govt. Code § 437.005(a). The same is true under Alaska law. Alaska Stat. § 26.05.070 ("the governor may order the organized militia or any part of it, into active state service to execute the laws and to perform duties in connection with them that the governor considers proper.").

42.     State laws dictate when State authorities may call upon their National Guards. Texas law grants broad authority for the use of State militias to quell domestic disturbances or assist in disaster relief when local and state government civil resources have been exhausted. *See* Tex. Govt. Code § 437.001 *et seq*. Alaska law is in accord. Alaska Stat. § 26.05.070 (authority to use National Guard "[i]n the event of war, disaster, insurrection, rebellion, tumult, catastrophe, wildland fire, invasion, or riot; or if a mob or body of men act together by force with intent to commit a felony or to offer violence to persons or property, or by force and violence to break and resist the laws of the state, or the United States; or in the case of imminent danger of the occurrence of any of these events; or whenever responsible civil authorities fail to preserve law and order, or protect life and property, or the governor believes that failure is imminent. . . .").

43.     In Texas, Guardsmen in state active duty status are not in "actual Service" of the United States, but rather perform their duties under the command and control of the Governor. National Guardsmen in this status are state funded. *See* Tex. Govt. Code § 437.212(a). Similarly, in Alaska, Guardsmen "not in active federal service" are under the command of the Governor, and Guardsmen in that status are state funded. Alaska Stat. §§ 26.05.060, .260, .270.

## D. Limited Federal Authority

44.     The federal government's authority over a State's National Guard and individual Guardsmen when not in the "actual Service" of the United States is severely constrained.

45.     The President "shall prescribe regulations, and issue orders necessary to organize, discipline, and govern the National Guard." 32 U.S.C. § 110; *cf.* U.S. Const. art. I, § 8, cl. 16. Title 32 itself recognizes that states cannot be forced to comply with federal requirements or regulations and, instead, gives the federal government certain remedies if a state chooses not to comply. *See, e.g.*, 32 U.S.C. § 108 (forfeiture of federal benefits).

46.     The federal government may also, in accordance with applicable laws and regulations, withdraw federal recognition of units and officers of the National Guard through the National Guard Bureau. *See* 10 U.S.C. § 10503. The federal government may withdraw federal recognition of an individual Guardsman if the Guardsman ceases to have the qualifications prescribed by the Secretary of the Army or Air Force, as applicable. 32 U.S.C. § 323(a).

47.     The respective Secretary may conduct inspections to determine whether Guardsmen meet physical and other qualifications, but members are not normally discharged due to failed inspections. *See* 32 U.S.C. § 105. The state commanders conduct discharges per federal regulations.

## V. Factual Background

48.     Defendants have attempted to extend their reach beyond what the U.S. Constitution (and federal law) allow and usurp the authority reserved to the states. These efforts will bring acute and irreparable harm to the Governor of Texas as Commander in Chief; the Governor of Alaska as

Commander in Chief; the State of Texas; the State of Alaska; and their citizens, residents, and guests.

49.      Before Defendants' attempt to apply the DoD vaccine mandate on non-federalized Guardsmen, Texas and Alaska, through their Governors' command, have ensured that their troops meet military readiness standards without compulsion, threat, or micromanagement from Defendants. For over eighteen months since the beginning of the COVID-19 pandemic, federal officials have not attempted to dictate or control disciplinary actions for vaccine compliance by non-federalized Guardsmen.

## A.  Secretary Austin's DoD memo.

50.      On August 24, 2021, Secretary of Defense Austin issued a memorandum to his senior military leadership. **Exhibit 1** at 1. With "the support of the President," Secretary Austin dictated his belief that the federal government had complete authority to compel all military members to participate in "mandatory vaccination against coronavirus disease 2019 (COVID-19)." *Id.* Consequently, the Secretary directed the Military Departments to "immediately begin full vaccination of all members of the Armed Forces under DoD authority on active duty or in the Ready Reserve, *including the National Guard*, who are not fully vaccinated against COVID-19." *Id.* (emphasis added). The Secretary concluded by calling for "ambitious timelines for implementation" of the vaccination mandate and demanding that Military Departments "report regularly on vaccination completion using established systems for other mandatory vaccine reporting." *Id.* at 2.

51.      On October 4, 2021, Governor Abbott sent a letter to Major General Tracy Norris, the Adjutant General of the Texas Military Department. **Exhibit 2** at 1. Pursuant to his authority as Commander in Chief, Governor Abbott made clear that Executive Order No. GA-39—commanding that "[n]o governmental entity can compel any individual to receive a COVID-19 vaccine"—governs the Texas National Guard. *Id.*; **Exhibit 3** at 3.

52.     On November 30, 2021, Secretary Austin issued an additional memorandum regarding vaccination of military servicemembers. This memorandum was particularly aimed at "members of the *non-federalized* National Guard who remain unvaccinated." **Exhibit 4** at 1 (emphasis added). Specifically, the Secretary ordered the "Secretary of the Army and the Secretary of the Air Force, in coordination with the Under Secretary of Defense for Personnel and Readiness and the Chief of the National Guard Bureau" to exercise authority over these non-federalized members in the form of:

- subjecting them to deadlines by which to be vaccinated if they wanted to continue "to participate in drills, training and other duty conducted under title 32, U.S. Code";

- withholding Department of Defense funding from non-federalized Guard members for "payment of duties performed under title 32" if they declined the COVID-19 vaccine; and

- depriving them of credit or excused absences if members, while unvaccinated, participated, or were prohibited from participating, "in drills, training or other duties."

*Id*.  No general legal authority or mechanism exists in which the Secretaries or any other agent of the federal government may withhold payment, service credits, and recognition for duties performed from individual servicemembers. Nonetheless, the Secretary's memorandum emphasized that the policies he ordered were to be similarly issued by each state's commanders in chief "with respect to members of the non-federalized National Guard." *Id*.  He closed with the demand that "[t]he policies and implementation guidance directed by this memorandum shall be published no later than December 6, 2021." *Id*.

53.     Directives and orders from the Secretaries of the Air Force and Army soon followed.

**B.  The Air Force memos and orders.**

54.     On December 7, 2021, Secretary of the Air Force Frank Kendall issued a memorandum regarding members of the Air Force, Space Force, Air Force Reserve, and Air National Guard. **Exhibit 5** at 1. Secretary Kendall declared "[v]accination against COVID-19 is an essential military readiness requirement for all components of the Air Force," which purportedly enables him to exercise authority over all personnel, including those in Title 32 status. *Id*.

55.     The December 7 memo stated that refusal to comply with the DoD vaccine mandate without an exemption "will result in the member being subject to the initiation of administrative discharge proceedings." *Id.*  Service members separated due to the refusal of the COVID-19 vaccine would not be eligible for involuntary separation pay and will be subject to recoupment of any unearned special or incentive pays. *Id.*

56.     In Attachment 2 to his memorandum, Secretary Kendall set out "supplementary guidance" for Air Guardsmen under Title 32 status. *Id.* at 5. Despite the term "guidance," Secretary Kendall declared compliance with the orders therein "mandatory." *Id.*

57.     Attachment 2 states that, in accordance with 32 U.S.C. § 328, Secretary Kendall "hereby withdraws consent for members not fully vaccinated to be placed on or to continue on previously issued Title 32 Active Guard and Reserve (AGR) orders." *Id.*

58.     Attachment 2 ordered Air Guardsmen under Title 32 status to be classified no later than December 31, 2021, based on their COVID-19 vaccine status. *Id.* It further ordered that Title-32 status Air Guardsmen who "have not initiated a vaccination regimen by December 2021 may not participate in drills, training, or other duty conducted under Title 10 or Title 32 U.S.C." *Id.* For "those with a remaining Military Service Obligation" Secretary Kendall demanded they be "involuntarily assigned to the Individual Ready Reserve (IRR) in accordance with 10 U.S.C. § 651 and DoDI 1235.13." *Id.* Secretary Kendall further threatened Title-32 status Air Guardsmen that they would "be subject to recoupment for any unearned special, incentive pays or certain training." *Id.* at 6.

## C. The Army memos and orders.

59.     In response to the order from the Secretary of the Defense, the Army issued an order on September 14, 2021, requiring every soldier not otherwise exempt to be vaccinated against COVID-19. This order included the Army National Guard. Failure to be vaccinated could result in adverse action including discharge.

60.     A subsequent order was issued on December 14, 2021, clarified that Army Guardsmen in Title 32 status were subject to the COVID-19 vaccination requirement and that the completion goal date was June 30, 2022. The order also stated that beginning on July 1, 2022, unless otherwise exempt, Title 32-status Army Guardsmen who were not vaccinated would not be permitted to participate in drills, training, or other duty, and would not receive any credit or excused absence for failure to participate due to non-vaccination. Also effective July 1, 2022, no payment would be allocated for payment of duties for guardsmen who did not comply with the COVID-19 vaccination requirement.

61.     On December 14, 2021, Governor Dunleavy wrote Secretary Austin, requesting he reconsider and withdraw his and the Service Secretaries' directives as to Title 32-status National Guardsmen. Secretary Austin did not respond.

**D. Impact of the memoranda and orders.**

62.     The secretaries' memoranda and orders require that Governors Abbott and Dunleavy, as Title 32 commanders, undertake specified governance and policy enforcement actions. Defendants' intrusion into the discretion and scope of Title 32 commanders' authority is contrary to the balance of power between federal and state officials set out by the U.S. Constitution and federal law. Should that intrusion be allowed, the harm to the States of Texas and Alaska and their respective Governors' authority as commanders in chief will be severe and multi-faceted.

63.     State sovereignty lies at the heart of the constitutional and statutory grant of the Governors' authority over their respective States' Air and Army National Guards. The memoranda and orders are an affront to State sovereignty in that they impermissibly override the Governors' statutory and constitutional authority as commanders in chief of their States' militaries to make regulations to govern those militaries.

64.     Should the federal secretaries' dictates stand, they will eliminate a substantial number of Air and Army National Guardsmen from the States' military forces. Guardsmen who refuse to obtain the COVID-19 vaccine will be prohibited from participating "in drills, training or other

duties." **Exhibit 5** at 5. Whether they participate or not, the Guardsmen's pay will be withheld—or subject them to recoupment—and they will be denied service credit for participation while unvaccinated. With this loss of pay and credit, Guardsmen may either take any available options to resign, or, ultimately, be administratively discharged.

65.    More than 220 members of the Texas Air National Guard under Governor Abbott's command are currently refusing to receive the COVID-19 vaccination for either religious accommodation needs or otherwise. Approximately 40% of the members of the Texas Army National Guard under the Governor's command are currently refusing to receive the COVID-19 vaccination for either religious accommodation needs or otherwise.

66.    No Texas Air National Guardsmen are currently exempted from the DoD vaccine mandate.[1]

67.    Approximately 8% of Alaska Air and Army National Guard members have not received a first dose of any COVID-19 vaccine. Of these unvaccinated Alaska National Guard members, more than 90% have requested a medical or religious exemption, yet no such exemptions have been granted. A small number of additional Alaska National Guard members are refusing any COVID-19 vaccine.

68.    Because DoD's actions, if upheld, will lead to the loss of these Guardsmen from the States' militias, the harm to each State is inevitable. Texas's and Alaska's Guardsmen are critical resources in maintaining the well-being and safety of the citizens, residents, and guests of the states of Texas and Alaska. Texas and Alaska will be significantly deprived of the military support they need to protect themselves from the challenges their citizens routinely face.

69.    In the event of a natural disaster, such as Hurricane Harvey where Governor Abbott mobilized almost 18,000 Guardsmen, or the unprecedented winter storm in February 2021, the

---

[1]    The Secretaries purport to allow servivcemembers to seek a religious exemption, but concurrent litigation on this score indicates that "by all accounts, it is theater" because no exemptions are provided. *Navy Seals 1-26*, slip op. at *1. Defendants' refusal to grant legitimate religious exemptions is intolerable, and contrary to the First Amendment.

Texas National Guard is frequently called upon by Governor Abbott to provide emergency services, search and rescue, medical care, evacuation efforts, assistance with local shelter, and logistical operations in the affected counties.

70.     The Texas National Guard also plays a key role in border security, ensuring the safety of Texas's citizens after the federal government's refusal to enforce federal immigration laws.

71.     Most notably, the Texas National Guard was mobilized soon after the pandemic began to assist the State's citizens in obtaining basic needs they were lacking. Guardsmen built hospitals, gathered and distributed medical supplies, assisted food bank operations, and provided other relief that lessened the economic and personal impact of COVID-19 on the State. In other words, the Guardsmen whose bravery and selflessness helped maintain and restore the State during the worst of the pandemic are now being forced to leave the service by Defendants for the servicemembers' decision to decline the COVID-19 vaccine.

72.     The harm to the State of Alaska is likewise inevitable. Alaska Guardsmen are a critical resource in maintaining the well-being and safety of the citizens of the State of Alaska.

73.     As recently as January 13 of this year, following a severe winter storm, members of the Alaska National Guard were deployed to perform building safety assessments and emergency snow removal for Tribal, public, and government facilities in the Southeast Community of Yakutat.

74.     In addition, the Alaska National Guard routinely responds to calls from civil authorities to support wildfire response efforts. In 2019, for example, the Guard has assisted at eight different fires in an area spanning more than 90,000 square miles.

75.     The Alaska National Guard also routinely conducts search and rescue operations throughout Alaska. In emergency situations, the Alaska National Guard is critical in providing a quick response, given the size of the state and the fact that many communities are off the road system.

76.     Whether the Guardsmen are permitted to remain on state active-duty service or not, the Defendants' illegal actions put Texas and Alaska at risk of losing federal funding for noncompliance. This financial impact to the States will cause significant, irreparable harm.

77.    Defendants' actions directly infringe on Governor Abbott's and Governor Dunleavy's authority as Commanders in Chief and on Texas's and Alaska's sovereignty and thus harm the Governors and States. Under Title 32, it is up to Governor Abbott and Governor Dunleavy to determine how to best govern their Guardsmen and meet the demands of Texas and Alaska while also complying with federal law. It is unlawful for Defendants to attempt to override the Governors' authority to govern their troops, and then leave the Governors and States to deal with the harms that they leave in their wake.

78.    Additionally, the Defendants seek to commandeer Title 32 personnel, who answer to the Governors as their Commander in Chief, to become enforcers of the DoD Vaccine Mandate, notwithstanding that to do so will violate state law and a direct order from Governor Abbott.

79.    This case is not about any individual's views on COVID-19 vaccines, which are an essential tool in combatting the pandemic. Rather, this case is about the federal government's unlawful encroachment on state sovereignty and authority—on the decisions of the States' Commanders in Chief on how to best manage one of Texas's and Alaska's most valuable resources for public safety and emergency response. Defendants simply cannot hijack Governor Abbott's and Governor Dunleavy's chain of command. If they wish to issue orders, they must do so under their own authority and pursuant to the law, not in spite of it.

## VI. Claims for Relief

80.    Plaintiffs expressly incorporate the allegations of each paragraph of this Complaint in the following counts. To the extent there is any perceived inconsistency, Plaintiffs expressly plead each count in the alternative.

### A. Count I: Ultra Vires Conduct
**Violation of U.S. Const. art. I, § 8; art. II, § 2**
**Against all Individual Defendants**

81.    Ultra vires review is available to review whether a government official "violated the Constitution, the statutes under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S.*

*Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

82.     The State of Texas, through its Commander in Chief, maintains control of its own Air and Army National Guard, and Governor Abbott commands the Texas Air and Army National Guard unless and until they are called into active federal service.

83.     The State of Alaska, through its Commander in Chief, maintains control of its own Air and Army National Guard, and Governor Dunleavy commands the Alaska Air and Army National Guard unless and until they are called into active federal service.

84.     Because the Governors are the sole Commanders in Chief of their respective non-federalized National Guardsmen, a federal official's ordering, directing, or punishing of such Guardsmen violates the Militia Clauses and the Commander-in-Chief Clause, which allows Defendants to "govern" such forces only while they are "employed in the Service of the United States," and allows the President to act as Commander in Chief of the "Militia" only "when called into the actual Service of the United States." *See also* 32 U.S.C. § 110.

85.     Defendants' orders implementing the DoD vaccine mandate and dictating specific punishments for non-federalized troops usurp the constitutional authority of Governors Abbott and Dunleavy, as Commanders in Chief over non-federalized National Guardsmen in their respective States, and violate the Militia Clauses.

86.     Defendants' orders and memoranda also contravene Texas law as promulgated by Governor Abbott, namely Executive Order GA-39, and so would, if implemented by Title 32 commanders, cause them to violate Texas law and disobey an order of their Commander in Chief, Governor Abbott.

87.     Defendants' orders and memoranda similarly contravene Alaska law, and so would, if implemented by Title 32 commanders, cause them to violate Alaska law and disobey an order of their Commander in Chief, Governor Dunleavy (*e.g.* Admin. Order 325, recognizing that imposing vaccine mandates on National Guard members without adequate protections in place for individuals with religious objections jeopardizes the constitutional rights of individual Alaskans

and directing, among other things, that no state agency participate with a federal agency, or spend state funds to participate in, or further any action by a federal agency that infringes on the constitutional rights of Alaskans).[2]

88.     Defendants' actions further threaten Texas's and Alaska's power to appoint officers of their militias, which is reserved to them by the Second Militia Clause. Defendants have purported to threaten Guardsmen, including officers, with consequences up to and including discharge for failure to comply with the Defendants' commands, which they must do if they are to abide by the commands and orders of their commanders in chief—Governor Abbott and Governor Dunleavy.

89.     Defendants' attempts to exercise command over Guardsmen in Title 32 status are unconstitutional, unlawful, and must be set aside.

**B.  Count II: Ultra Vires Conduct**
   **Violation of Tenth Amendment**
   **Against all Individual Defendants**

90.     The structure of the U.S. Constitution and the text of the Tenth Amendment protect federalism and state's sovereignty.

91.     The powers not delegated by the Constitution to the federal government are reserved to the states.

92.     Through their orders applying the DoD vaccine mandate to National Guardsmen under state control, and by requiring officers under state control to take specified disciplinary actions against such Guardsman for violation of federal orders, Defendants attempt to exercise power beyond that delegated to them under the U.S. Constitution.

---

[2]   The mandate would also override Alaskans' fundamental right to privacy, as enshrined in the Alaska Constitution. That fundamental right includes the right to make decisions about medical treatment. *See Huffman v. State*, 204 P.3d 339 (Alaska 2009) (citing Alaska Const. art. I, § 22). Further, the mandate ostensibly preempts an Alaska statute that broadly protects all Alaskans' rights to object to COVID-19 vaccines "based on religious, medical, or other grounds," and that forbids requiring an individual to provide justification or documentation to support the individual's decision to decline a COVID-19 vaccine. 2021 Alaska Sess. Laws ch. 2, § 17.

93.     By interfering with the traditional balance of power between the states and the federal government, Defendants are violating the Tenth Amendment and structural principles of federalism, and their actions are unconstitutional, unlawful, and must be set aside.

## C. Count III: Ultra Vires Conduct
   Violation of Federal Law—Title 10 and Title 32
   Against all Individual Defendants

94.     Through their orders applying the DoD vaccine mandate to National Guardsmen under state control, and by requiring officers under state control to take specified disciplinary actions against such Guardsman for violation of federal orders, Defendants attempt to exercise power beyond that delegated to them under Titles 10 and Title 32 of the United States Code. Their actions are unlawful and must be set aside.

## D. Count IV: Administrative Procedure Act
   Arbitrary and Capricious Agency Action, 5 U.S.C. § 706
   Against all Agency Defendants

95.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." *See* 5 U.S.C. § 706 (2)(A). "[A]gency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). An agency "rule" is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *Id.* § 551(4).

96.     An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Military decisions are not shielded from substantive review under the APA review simply because it is the military that has acted arbitrarily and capriciously. *See, e.g.*, *Kuang v. U.S. Dept. of Defense*, 778 F. Appx. 418, 420 (9th Cir. 2019).

97.     The Agency Defendants' memoranda and directives constitute final agency action.

98.     Defendants have not adequately explained their implementation of the DoD vaccine mandate as applied to non-federalized Texas and Alaska Guardsmen in Title 32 status, and their failure to do so is arbitrary and capricious. Governor Abbott and Governor Dunleavy are the Commanders in Chief of their respective forces and are responsible for the governance of Texas and Alaska forces unless placed into a federalized Title 10 status. Defendants have not articulated any basis for interfering with the Governors and their chain of command, and they have not considered any of the other countervailing interests that would counsel against their unlawful actions.

99.     The stark differences between the implementation of the DoD vaccine mandate among the branches—the Texas and Alaska Air National Guards face imminent and immediate deadlines, whereas the Texas and Alaska Army National Guards have months to comply—further reflects the lack of a rational connection between the professed goal of troop readiness and the unlawful means of achieving it.

100.    Defendants' challenged actions are arbitrary and capricious and must be set aside.

## E.  Count V: Administrative Procedure Act
Arbitrary and Capricious Agency Action, 5 U.S.C. § 706
Against all Agency Defendants

101.    Further, the Agency Defendants' actions evince no consideration of Texas's and Alaska's substantial reliance interests in their respective National Guard's availability to provide emergency services, search and rescue, medical care, evacuation efforts, assistance with local shelter, and logistical operations.

102.    Those affected by changes in rules or policies are entitled, at the least, to consideration of any reliance interests that developed around the since-rejected policy. *See Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913–14 (2019). The Agency Defendants' memoranda and orders evince no consideration of these interests—interests upon which the lives and livelihoods of uncounted Texans and Alaskans depend.

103.    Because the Agency Defendants did not consider interests they were required to consider before promulgating the orders and memoranda subjecting the Texas and Alaska National Guards to DoD's vaccine mandate, their actions are arbitrary and capricious and must be set aside.

**F.  Count VI: Administrative Procedure Act**
   **Arbitrary and Capricious Agency Action, 5 U.S.C. § 706**
   **Against all Agency Defendants**

104.    Reliance interests and lack of adequate explanation to the side, the Agency Defendants' actions are arbitrary and capricious for an even more basic reason: As described above, their actions rest on the erroneous premise that they have the legal authority to subject Governor Abbott, Governor Dunleavy, and the Guardsmen under their command to the memoranda and orders that they have issued demanding state-military compliance with a federal-military vaccine mandate. They do not.

105.    A decision is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' . . . if the agency applies an incorrect legal standard." *Gen. Land Office v. U.S. Dept. of Interior*, 947 F.3d 309, 320 (5th Cir. 2020). And no legal standard is more basic than whether the agency has the power to subject someone to its power in the first place. An agency "that loses track of its own controlling regulations and applies the wrong rules in order to penalize private citizens" is one whose actions "can never stand." *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 977 (10th Cir. 2016) (Gorsuch, J.). That is what the Agency Defendants have done here.

106.    The Agency Defendants have no statutory authority to demand compliance by the Governors or by the Guard units and Guardsmen under their commands. The memoranda and orders demanding that compliance are therefore in excess of statutory jurisdiction and authority and otherwise not in accordance with law. 5 U.S.C. § 706(2)(A), (C). The Agency Defendants' memoranda and orders exceed the authority granted to the federal government by the federal constitution and invade the rights reserved to the States, and to the plaintiffs as the Governors of

those States, by that same constitution. They are therefore contrary to constitutional right and power. *Id.* § 706(2)(B). They must be set aside.

## G. Count VII: Declaratory Judgment Against all Defendants

107.    The federal Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The issuance of a declaratory judgment can serve as the basis for an injunction to give effect to the declaratory judgment. *Steffel v. Thompson*, 415 U.S. 452, 461 n. 11 (1974).

108.    For the foregoing reasons, and pursuant to each of the above Counts, Plaintiffs are entitled to a declaratory judgment establishing their authority to govern the Texas and Alaska National Guards while they remain in Title 32 status and, if necessary, an injunction to effectuate that declaratory judgment.

## VII. Prayer for Relief

For these reasons, Plaintiffs pray that the Court:

1.  Declare that the DoD Vaccine Mandate and its enforcement against non-federalized Texas and Alaska National Guardsmen violates the U.S. Constitution and federal law;

2.  Declare that Defendants' actions in imposing and enforcing the DoD Vaccine Mandate against non-federalized Texas and Alaska National Guardsmen are *ultra vires*;

3.  Set aside the DoD Vaccine Mandate as applied to non-federalized Texas and Alaska National Guardsmen;

4.  Preliminarily and permanently enjoin the Defendants, and any other agency or employee of the Unites States, or any individual working in concert with them, from enforcing the DoD Vaccine Mandate as to non-federalized Texas and Alaska National Guardsmen;

5.  Award Plaintiffs their costs and reasonable attorneys' fees.

6.  Award such other relief as the Court deems equitable and just.

Dated January 25, 2022.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

Respectfully submitted,

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief, General Litigation Division

CHRISTOPHER D. HILTON
Texas Bar No. 24087727
Assistant Attorney General
General Litigation Division

*/s/ Leif A. Olson*
LEIF A. OLSON
Texas Bar No. 24032801
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
christopher.hilton@oag.texas.gov
leif.olson@oag.texas.gov

**COUNSEL FOR GOVERNOR ABBOTT**

TREG R. TAYLOR
Attorney General of Alaska

CORI M. MILLS
Deputy Attorney General of Alaska

*/s/ Christopher A. Robison*
CHRISTOPHER A. ROBISON
Texas Bar No. 24035720
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

**COUNSEL FOR GOVERNOR DUNLEAVY**