UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

———

No. 6:22-cv-00003

———

**Greg Abbott et al.,**
*Plaintiffs,*

v.

**Joseph R. Biden et al.,**
*Defendants.*

———

## OPINION AND ORDER

For the reasons set forth below, plaintiffs' motion for a preliminary injunction (Doc. 24) is denied.

### Background

Pursuant to Federal Rule of Civil Procedure 52(a)(2), the court makes the following findings.

**1.** COVID-19 is a disease caused by a virus "discovered in December 2019 in Wuhan, China" that "has quickly spread around the world." Centers for Disease Control and Prevention, *Basics of COVID-19* (Nov. 4, 2021), www.cdc.gov/coronavirus/ 2019-ncov/your-health/about-covid-19/basics-covid-19.html. Although "most people with COVID-19 have mild symptoms, . . . some people become severely ill," and some die. *Id.*

Scientists have now developed COVID-19 vaccines. After going through multiple clinical trials to ensure they are safe and effective, two COVID-19 vaccines have received full FDA approval for adults and certain minors. Centers for Disease Control and Prevention, *Developing COVID-19 Vaccines* (Feb. 4, 2022), www. cdc.gov/coronavirus/2019-ncov/vaccines/distributing/steps-ensure-safety.html.

The federal government recommends vaccination against COVID-19 for everyone who is eligible. Centers for Disease Control and Prevention, *How to Protect Yourself & Others* (Feb. 25, 2022), www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/

prevention.html. So do the States of Texas and Alaska. Tex. Dep't of State Health Servs., *COVID-19 Vaccine Information*, https://dshs.texas.gov/covidvaccine/ ("recommend[ing] COVID-19 vaccination for everyone"); Alaska Dep't of Health & Soc. Servs., *Stay Up to Date with Your COVID-19 Vaccines*, dhss.alaska.gov/dph/Epi/id/Pages/COVID-19/vaccineappointments.aspx ("COVID-19 vaccines are recommended for everyone 6 months and older.").

But not everyone pursues COVID-19 vaccination. That fact gives rise to policy decisions, which in the military context must balance interests such as public defense, individual choice, personal sacrifice, workforce attrition, and public health. One such decision is how to address members of the militia who lack COVID-19 vaccination.

**2.** The militia is the body of armed citizens capable of acting in concert for the common defense, but not kept on active service in times of peace. *United States v. Miller*, 307 U.S. 174, 179 (1939); *Perpich v. Dep't of Def.*, 496 U.S. 334, 348 (1990).

The Constitution gives Congress the power to provide for "organizing, arming, and disciplining" the militia, so that the militia may be readily integrated into national service. U.S. Const. art. I, § 8, cl. 16 (second Militia Clause). "Discipline" here refers to "the rules . . . by which the militia is to be governed." *Houston v. Moore*, 18 U.S. 1, 14 (1820).

Authority to govern the militia, when called into the actual service of the United States, is entrusted to the President of the United States. U.S. Const. art. II, § 2. But when the militia is not called into national service, federal officials lack the power of "governing" the militia. *Id.* Instead, the power of governing such a militia, albeit pursuant to federal discipline, rests with its commanders under state law. *See Houston*, 18 U.S. at 16–17. Those state commanders also maintain the power to appoint militia officers. U.S. Const. art. I, § 8, cl. 16.

Regardless of whether the militia is called into national service, Congress has the separate power to spend federal funds for

the common defense and put conditions on that federal funding. *Id.* cl. 1 (Spending Clause).

Congress has exercised its power to legislate on the issue of militia organization and funding by defining two, related organizations:

(1) the National Guard of each state, which is that part of the state's militia that is organized and recognized under federal standards, funded federally in any part, and whose officers are appointed by the States under the second Militia Clause of the Constitution, *see* 32 U.S.C. § 101(3), (4), (6); and

(2) the National Guard of the United States, which is a reserve component of the Army, established pursuant to Congress's constitutional authority to "raise and support armies," but whose members are all members of the National Guard, *see* 32 U.S.C. § 101(5), (7).

Both organizations have distinct Army and Air Force components. *See* 32 U.S.C. § 101.

To enlist in the subset of a state's militia that receives federal funding and recognition as the National Guard, a person must also enlist at the same time in the National Guard of the United States. That dual-enlistment regime is meant to improve militia reliability and eliminate the need to draft militia members when calling them into federal service, as they have already enlisted in a reserve component of the Army. *See Perpich*, 496 U.S. at 340–45.

When not federalized, National Guard members remain on so-called title 32 status. They are governed by their state commander-in-chief. But they must follow rules and standards set by the President, pursuant to a delegation of Congress's authority under the second Militia Clause. 32 U.S.C. § 110. For their title 32 service under federal discipline, National Guard members are given pay and benefits from federal funds, which are managed by the Defense Finance and Accounting Service, a Department of Defense agency. Doc. 33-1 at 8 ¶ 20.

The federal funding and recognition of a National Guard component of a state's militia does not preclude a state from organizing other militia components, made of individuals who do not meet the dual-enlistment condition or other conditions of federal funding. Those militia components are known as state defense forces. 32 U.S.C. § 109(c).

Texas and Alaska each have a state National Guard that is commanded, when not in federal service, by each State's governor. Each also has a state defense force. Tex. Gov't Code §§ 437.001(15), (16), 437.002; Alaska Stat. §§ 26.05.010(b)(1), 26.05.060, 26.05.100.

**3.** The federal military began requiring immunization in 1777, when General Washington directed the inoculation of the Continental Army for smallpox. Those requirements have expanded in modern times. For the past several decades, the military has required at least nine immunizations, such as an annual flu shot. That requirement applies to members of reserve components of the armed forces, including National Guard members. *See* Department of Defense, DoD Instruction 6205.02-DoD Immunization Program at 7 § 2.4 ( July 23, 2019) (mandating consistent immunization policy for reserve and active components); 10 U.S.C. § 10101 (defining reserve components of the armed forces to include the National Guard).

The vaccination mandate at issue here was added the day after the FDA first gave full approval to a COVID-19 vaccine. Five separate executive actions contribute to that vaccination mandate as applied to National Guard members:

- On August 24, 2021, the Secretary of Defense issued a memorandum adding the COVID-19 vaccine to the list of required vaccines for service members. Doc. 25-1.

- On September 14, 2021, the Army ordered every soldier not otherwise exempt, including members of the Army National Guard, to be vaccinated against COVID-19. *See* Doc. 4 at 12.

- 4 -

- On November 30, 2021, the Secretary of Defense issued a memorandum imposing COVID-19 vaccination as a requirement for title 32 service. Doc. 25-4.
- On December 7, 2021, the Air Force implemented the Secretary's order as to Air National Guard members. Doc. 25-5.
- On December 14, 2021, the Army implemented the Secretary's order as to Army National Guard members. *See* Doc. 4 at 13.

Collectively, those executive actions create the following consequences for a National Guard member out of compliance with the military's vaccination requirement: (1) disqualification from participation in drills, training, and other title 32 duties; (2) disqualification from federal pay for National Guard service; (3) withdrawal of the Secretary's consent for a member to serve under title 32, and (4) discharge from the federally funded and recognized National Guard.

In other words, those executive actions define a vaccination condition of the federal government's continued allowance of pay, benefits, and recognition for service in a National Guard component of a state militia. Plaintiffs and defendants agree that the executive actions do not allow federal military officials to order a non-federalized National Guard member imprisoned for disobedience. Plaintiffs and defendants also agree that the executive actions do not impose a vaccination requirement for militia activities not funded by the federal government.

**4.** On August 25, 2021, Governor Abbott issued an executive order directing that no governmental entity under the laws of the State of Texas can "compel any individual to receive a COVID-19 vaccine." Doc. 25-2 at 4 ¶ 1. The order applies to members of the state militia, whether in the Texas National Guard or the Texas State Guard (the state defense force). Doc. 25-3. A subsequent letter from the Governor to the Secretary of Defense confirms that state officials do not enforce the vaccination condition of title 32 service and federal pay. Doc. 25-9. Accordingly, the Governor

made clear that "[i]f unvaccinated guardsmen suffer any adverse consequences within the State of Texas, they will have only President Biden and his Administration to blame." *Id.*

On November 2, 2021, Governor Dunleavy issued an administrative order stating that the federal government violated constitutional rights by imposing a National Guard vaccine mandate without adequate religious-objector protections and directing that state agencies may not participate in federal action that violates constitutional rights. Gov. Dunleavy, Admin. Order 325, gov.alaska.gov/admin-orders/administrative-order-no-325/.

Governors Abbott and Dunleavy then filed this action against the President, the Department of Defense, the Secretary of Defense, and the Secretaries of the Army and Air Force. Plaintiffs contend that the DoD vaccination requirement for the non-federalized National Guard exceeds constitutional and statutory authority and violates the Administrative Procedure Act as arbitrary and capricious. As relief, plaintiffs seek an order declaring the vaccination requirement unlawful, setting it aside, and enjoining its implementation as to Texas and Alaska National Guard members.

Governor Abbott moved for a preliminary injunction. Doc. 24. Governor Dunleavy filed a brief, in which he joined in Governor Abbott's motion and requested further, conditional relief: that "any injunction the Court might issue likewise enjoin Defendants from applying the Enforcement Memoranda to non-federalized members of the Alaska National Guard." Doc. 27 at 2. The court accepts that joinder of Governor Abbott's sufficient motion. But Governor Dunleavy's brief is unaccompanied by evidentiary exhibits, a proposed order, or a certificate of conference. So, to the extent that Governor Dunleavy independently moves for relief, that motion is denied for lack of evidentiary support and noncompliance with the court's local rules. *See* E.D. Tex. R. CV-7(a), (b), (i). The court received briefing and heard argument on Governor Abbott's motion for a preliminary injunction and now issues its conclusions and ruling.

## Analysis

A party seeking a preliminary injunction must show a substantial likelihood of success on the merits. *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013). Accordingly, the court considers the merits of plaintiffs' claims.

**1.**  Counts one, two, three, and six of the amended complaint all present, in various ways, the contention that the DoD vaccination mandate exceeds defendants' statutory and constitutional authority. Plaintiffs first seek preliminary relief on those arguments.

**a.**  As to statutory authority, Congress has conferred on the President the power to prescribe regulations and issue orders necessary to discipline the National Guard. 32 U.S.C. § 110. Other statutes devolve the President's authority to the Secretary of Defense and military-department Secretaries. *See, e.g.*, 10 U.S.C. § 10202.

Plaintiffs do not dispute that requiring guardsmen to be vaccinated against COVID-19 falls within defendants' statutory authority to impose readiness requirements for the National Guard. Doc. 36 (Pls. Reply) at 1 (disclaiming such an argument); Doc. 24 at 8 (not disputing that the federal government may "add COVID-19 vaccination to the list of standards prescribed for Guardsmen under 32 U.S.C. § 110").

Rather, plaintiffs' statutory argument turns on how that readiness requirement is enforced. Plaintiffs concede that the President may withhold federal funds for failure to meet federal standards. Doc. 24 at 8. But plaintiffs argue that the President is authorized only to deprive National Guard "units" of federal funding, as opposed to depriving "individual Guardsmen" of federal funding by excluding them from National Guard recognition and pay. *Id.* at 8–9.

The relevant statute allows the President to bar federal funding "in whole or in part" to a National Guard of a State if the State fails to comply with a regulation issued under title 32:

> If, within a time fixed by the President, a State fails to comply with a requirement of this title, or a regulation prescribed under this title, the National Guard of that State is barred, in whole or in part, as the President may prescribe, from receiving money or any other aid, benefit, or privilege authorized by law.

32 U.S.C. § 108. And the National Guard is comprised of its property and members. *E.g.*, 32 U.S.C. § 105 (discussing inspection to determine which "persons constitute units and members of the National Guard"). Consequently, denying the use of federal funds to pay some members of the National Guard of a State is denying funding "in part" to that National Guard.

Excluding persons from National Guard duties and membership also appears to be within the scope of the President's § 108 authority to withhold funding. That exclusion does not remove the person from the militia organized by a State. It does not create any penalties for the person continuing to serve in the state militia, albeit without federal funding. It simply refuses to recognize the person as among the individuals who meet the statutory definition of the Army National Guard or the Air National Guard, as those definitions embrace only "that part" of the militia of the States that is organized at federal expense and is federally recognized. 32 U.S.C. §§ 101(4), (6).

At the motion hearing, plaintiffs also argued that the § 108 funding-forfeiture authority cannot be triggered by an individual National Guard member's failure to comply with title 32 regulations. The statute refers to noncompliance by "the State" but does not define that term.

Statutory context, however, shows that a state's compliance for purposes of § 108 may be judged by the conduct of individual members of that state's organized militia. For one, title 32 refers to an organized militia as being "of" a State, indicating Congress's

treatment of compliance by the militia, or a part thereof, as itself being the compliance "of" the State for funding purposes.

Moreover, plaintiffs do not articulate what narrower class of actions would, in their view, constitute action by "the State." Presumably, it cannot be as narrow as only an official resolution adopted by a state legislature, as that would allow the absence of an official resolution to excuse noncompliance by every member of the National Guard of a State. But that same inferential reasoning can be applied at every step down the conceptual ladder of governance of a National Guard. The only logical stopping point, it seems, is that the term embraces all conduct of a State's National Guard, including compliance by individual members. That understanding also comports with the statute's declared policy of ensuring "that the strength and organization of the Army National Guard and the Air National Guard as an integral part of the first line defenses of the United States be maintained and assured *at all times*." 32 U.S.C. § 102 (emphasis added).

As plaintiffs agreed at the hearing, the vaccination requirement at issue is enforced only through a denial of federal pay, federal benefits, and federal recognition that enables those federal pay and benefits. Defendants represented, without contradiction, that the vaccination requirement at issue cannot result in a federal official ordering a non-federalized member of a state militia to be imprisoned for disobedience. So the state remains free to organize and discipline a militia without a vaccination mandate, simply without federal funding. *See Oklahoma v. Biden*, No. Civ-21-1136-F, 2021 WL 6126230, at *10 (W.D. Okla. Dec. 28, 2021) ("If the Guard fails to comply with federal standards, the President is empowered to cut off its funding . . . . If a state should find federal standards governing the *National* Guard to be too tight a fit, the state is free to establish (and pay for) its own, independent version.").

Plaintiffs do note that depriving militia members of inclusion in the National Guard recognized and funded by the federal government may also carry a stigma. But the law does not recognize

stigmatic injuries as a general principle. *See Allen v. Wright*, 468 U.S. 737, 755 (1984); *McMahon v. Fenves*, 946 F.3d 266, 271–72 (5th Cir. 2020) (holding that "indignation" and "psychological injury" are not cognizable). So plaintiffs' statutory-authority claim is resolved by the conclusion that the enforcement consequences here fall within the authority granted by 32 U.S.C. § 108.

**b.**   That conclusion about how the COVID-19-vaccination requirement is enforced also leads to rejection of plaintiffs' constitutional-authority argument. Again, plaintiffs accept that the federal government may order COVID-19 vaccination as a readiness standard for the National Guard, pursuant to Congress's constitutional authority to prescribe discipline for the militia. Doc. 24 at 8. Plaintiffs also concede that this lawsuit "does not contest the President's authority to withhold funds, in accordance with 32 U.S.C. § 108," from a State that fails to comply with the COVID-19-vaccination requirement. *Id.* at 13.

The crux of the constitutional challenge is that defendants are "governing" the militia by imposing "punishment" on individual militia members. *Id.* at 8. But, looking past labels, the consequences at issue are only an inability to receive federal pay, benefits, and recognition for militia service not compliant with federal regulations. There is no prospect of federal officials excluding individuals from an organized militia, as a State is free to organize the militia into a defense force funded solely by the State. 32 U.S.C. § 109(c). Nor does any party claim that a federal official may imprison a non-federalized militia member for failure to comply with the vaccination requirement.

The court's attention has not been called to any precedent holding that enforcing a condition of federal funding for members of the National Guard is equivalent to "governing" the militia within the meaning of the second Militia Clause. Nor do any of the historical sources cited by plaintiffs go that far. Rather, enforcing funding conditions appears to be squarely within Congress's authority under the Spending Clause to provide federal funds for the common defense. The Constitution allows Congress, if it chooses

to spend federal funds, to fix conditions on the receipt of federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). And there is no Spending Clause claim in this case.

For these reasons, the court concludes that plaintiffs have not shown a substantial likelihood of success on the merits of their claims that the challenged executive actions exceed statutory or constitutional authority.

**2.**  Plaintiffs also seek a preliminary injunction on their claims that the mandate is arbitrary and capricious within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Plaintiffs argue that defendants ignored the interest in the Texas National Guard's ability to serve Texas citizens, which will be diminished if guardsmen leave rather than get vaccinated. Doc. 4 at 20–21.

The wisdom of the vaccination mandate is not before the court. The court may not substitute its judgment for that of the federal decisionmaker but, instead, must confine its inquiry to ensuring that the decision is within the bounds of reasoned decision-making. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019).

Judgments about military readiness, moreover, warrant particular humility in judicial review. The Supreme Court has found it "difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). The Court explained that the "complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control . . . [by] branches of the government which are periodically subject to electoral accountability." *Id.*

The vaccination requirement at issue here passes that deferential review. The court does not downplay the significant contributions made by the Texas National Guard. The militia plays a valuable role in suppressing violence, protecting citizens in times of natural disaster, and defending the country. *See generally District of Columbia v. Heller*, 554 U.S. 570, 597–98 (2008). The record contains powerful evidence of the Texas National Guard's

vital role in responding to natural disasters and supplementing law enforcement in the State.

But the Secretary of Defense noted the importance of all components of the nation's fighting forces, including the National Guard. Doc. 25-1 at 2 ("To defend this Nation, we need a healthy and ready force."); Doc. 25-4 at 2 ("Vaccination is essential to the health and readiness of the Force. . . . Vaccination of the Force will save lives and is essential to our readiness."). Federal officials simply balanced the policy interests differently than would Governor Abbott. Plaintiffs also argue that defendants failed to consider Texas's reliance interests in the former policy. But the Secretary of Defense ordered vaccination efforts to begin just one day after the FDA issued the first full approval of a COVID-19 vaccine. Substantial reliance interests could not develop in a non-vaccination policy lasting just one day.

**3.**  Because plaintiffs have not shown a substantial likelihood of success on the merits of their claims, for the reasons explained above, the court need not consider the other requirements to obtain a preliminary injunction. The motion for a preliminary injunction (Doc. 24) is denied.

*So ordered by the court on June 24, 2022.*

J. CAMPBELL BARKER
United States District Judge