```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  EASTER DISTRICT OF TEXAS

 3                       TYLER DIVISION

 4
    GOVERNOR GREG ABBOTT, in his      )  Case No. 6:22-cv-00003
 5  official capacity as Governor     )
    of the Sate of Texas, and         )
 6                                     )
    GOVERNOR MIKE DUNLEAVY, in his     )
 7  official capacity as Governor     )
    of Alaska,                        )
 8                                     )
         Plaintiffs,                   )
 9                                     )
    versus                            )
10                                     )
    JOSEPH R. BIDEN, in his official   )
11  capacity as President of the       )
    United States; DEPARTMENT OF       )
12  DEFENSE; LLOYD AUSTIN, in his      )
    official capacity as Secretary of  )
13  the Defense; DEAPRTMENT OF THE AIR )
    FORCE; FRANK KENDALL III, in his   )
14  official capacity as Secretary of  )
    the Air Force; DEPARTMENT OF THE   )
15  ARMY; and CHRISTINE WORMUTH, in    )
    her official capacity as Secretary )
16  of the Army,                       )
                                       )
17       Defendants.                   )  JUNE 23, 2022
    _____)  MOTION HEARING

18

19                  TRANSCRIPT OF PROCEEDINGS

20        BEFORE THE HONORABLE JUDGE J. CAMPBELL BARKER

21                 UNITED STATES DISTRCIT JUDGE

22  SUSAN A. ZIELIE, FCRR, RMR
    FEDERAL OFFICIAL STENOGRAPHIC COURT REPORTER
23  United States District Court
    Eastern District of Texas
24  211 West Ferguson Street
    Tyler, Texas 75701
25  susan_zielie@txed.uscourts.gov
```

```
 1                              APPEARANCES

 2       For Plaintiff TEXAS:

 3       CHRISTOPHER D. HILTON, ESQ.
         Office of the Texas Attorney General
 4       PO Box 12548
         Capitol Station, MC-019
 5       Austin, TX 78711-2548
         512-475-4120
 6       christopher.hilton@oag.texas.gov

 7       LEIF A. OLSON, ESQ.
         Office of the Texas Attorney General
 8       PO Box 12548
         Capitol Station, MC-019
 9       Austin, TX 78711-2548
         512-475-4031
10       leif.olson@oag.texas.gov

11       For Plaintiff ALASKA:

12       CHRISTOPHER A. ROBISON, ESQ.
         State of Alaska
13       Department of Law
         Office of the Attorney General
14       1031 W. 4th Avenue
         Suite 200
15       Anchorage, AK 99501
         907-269-5100
16       chris.robison@alaska.gov

17       For Defendants:

18       ZACHARY A. AVALLONE, ESQ.
         United States Department of Justice
19       1100 L Street, NW
         Washington, DC 20005
20       202-514-2705
         zachary.a.avallone@usdoj.gov
21
         JAMES GARLAND GILLINGHAM, ESQ.
22       United States Attorney's Office
         110 North College
23       Suite 700
         Tyler, TX 75702
24       903-510-9346
         james.gillingham@usdoj.gov
25
```

08:49:21 (3)
08:49:21 (5)
08:49:21 (8)
08:49:21 (10)
08:49:21 (13)
08:49:21 (15)
08:49:21 (18)
08:49:21 (20)
08:49:21 (23)

1          TYLER, TEXAS; JUNE 23, 2022, THURSDAY

2                    10:00 A.M.

3          THE COURT:  Please be seated.  Good morning.  We're

4     here for a hearing in Case Number 6:22-cv-3, Abbott versus

10:07:45   5     Biden.

6          Will the parties please make their appearances.

7          MR. HILTON:  Chris Hilton from the Attorney

8     General's Office on behalf of Governor Abbott.  I'm joined by

9     my colleague, Leif Olson.

10:08:00   10          MR. ROBISON:  Good morning, Your Honor.  Chris

11    Robison from the Alaska Attorney General's Office on behalf

12    of Governor Dunleavy.

13          MR. AVALLONE:  Good morning.  Zachary Avallone from

14    the US Department of Justice, here on behalf of defendants.

10:08:15   15          MR. GILLINGHAM:  Your Honor, James Gillingham with

16    the Unites States Attorney's Office on behalf of defendants.

17          THE COURT:  Very well.  Thank you.

18          Before the court is plaintiffs' motion for

19    preliminary injunction, and I've read all of the motion

10:08:27   20    briefing.

21          Let me begin by hearing briefly from plaintiffs.  I

22    want to first address my understanding of how the National

23    Guard system relates with the relevant constitutional

24    provisions.

10:08:48   25          So I'll take a minute and lay out my reading of the

4

10:09:10

1   Constitution and how that overlays with the relevant
2   statutory provisions establishing the National Guard system
3   and then let you correct me where I've misspoken or you
4   disagree or you think there's some other provisions that I
5   ought to look at.

6        The relevant constitutional provisions concerning
7   militia are in Article I, Section 8 of the Constitution,
8   along with a series of clauses, Clauses 12 through 16, that
9   all concern the various parts of the fighting forces of the
10  country; Article II, which makes the President the
11  commander-in-chief of the Army and Navy and then also of the
12  militia when called into the national service; and then, of
13  course, the Second Amendment mentions the militia as well.

14       At the time of the founding of the common law, the
15  militia was essentially just able-bodied men of fighting age.
16  That understanding of the militia still exists today, and the
17  Supreme Court has recognized that governance of the militia,
18  as a matter of background law, outside of constitutional
19  authority, rests with the states.  Under the laws of Texas
20  and Alaska, the commander-in-chief of the militia is the
21  governor of each respective state.

22       However, each state has organized its militia --
23  although, each state also, I believe, recognizes an
24  unorganized broader militia that's out in the diffuse
25  population -- but each state has organized its militia and

10:09:31

10:09:54

10:10:20

10:10:37

1    imposed order and rules for its militia.

2         Congress's power over the militia includes the

3    power, under Section 8 of Article I, Clause 15, to call the

4    militia into federal service if certain conditions are met.

10:11:05   5    And then, under Clause 16, Congress is given the power over

6    the militia, when not in federal service, to organize, arm,

7    and discipline the militia.  However, the power to govern the

8    militia and to appoint officers is reserved to the State;

9    and, as to governance, turns to Congress only when the

10:11:31   10    militia is called into national service.

11         Likewise, Article II recognizes the President's

12    commander-in-chief power only when the militia has been

13    federalized.

14         The National Guard system was created by Congress

10:11:53   15    by statute.  It was created in a series of amendments over

16    time; but, as I understand, it essentially reached its final

17    form in the 1930s, I believe in 1933, as a result of

18    modernization that took place starting in the 1900s, and

19    creates -- in Title 32 of the United States Code, Congress

10:12:19   20    has created two entities that are defined in Section 101.

21         One entity is called the National Guard, and that

22    refers to the National Guard of the various states.  It has

23    an Army component and an Air Force component.  And the second

24    entity is the National Guard of the United States, which also

10:12:40   25    has an Army and an Air Force component.

1            And, essentially, the National Guard -- the

2    definition of the National Guard refers to a subset of the

3    militia in a state.  To qualify as being in that subset of

4    the militia, who is -- and it also defines being in the

10:13:05   5    National Guard -- members have to meet certain requirements

6    laid out in the statute, in the definitional section of that

7    statute.

8            Essentially, they have to be federally recognized.

9    They have to be part of the organized militia of a state.

10:13:19  10    They have to be part of the militia in the sense that the

11    state governor appoints their officers, as understood in

12    Article I, Section 8, Clause 16.  And then the statute in

13    other provisions lays out what's required to receive federal

14    recognition.

10:13:42  15            Also, to be part of the National Guard as defined

16    in the statute, a member must volunteer to be dual-enlisted

17    in the National Guard of the United States, which is defined

18    as a reserve component of the Army.

19            In this case, the United States agrees with the

10:14:07  20    plaintiffs -- I believe I agree as well -- that membership in

21    the reserve component of the Army does not mean that the

22    person is always under the President's Article II

23    commander-in-chief power.  Rather, the person must first be

24    activated or called into active service in the Army to fall

10:14:30  25    within the President's constant Article II power.  Otherwise,

1   the reservation of the militia limitations in Article I and

2   Article II apply to members in reserve status.

3          So, if a member of the state militia meets these

4   definitional requirements in the federal statute, that member

10:15:01   5   of the militia and then, collectively, the unit of all those

6   members are recognized under federal law as part of the

7   National Guard, and the same members are also recognized as

8   part of the National Guard of the United States.

9          And that, in turn, qualifies that particular subset

10:15:22   10   of the militia for federal benefits.  The federal government

11   will pay those people for their time.  They will provide the

12   potential for retirement benefits, and they can accrue credit

13   or points towards the retirement benefits.  The federal

14   government provides equipment, and it may pay the National

10:15:49   15   Guard for the cost of maintaining or replenishing that

16   equipment.  So there's a whole host of federal benefits that

17   the federal government confers on units and members who meet

18   the federal government's requirements of the National Guard.

19          That spending is within Congress's constitutional

10:16:14   20   power under both the spending clause of the Constitution and

21   as to arming that subset of the militia, also under Article

22   I, Section 8, Clause 16, which refers to arming the militia.

23   But, in other respects, spending money on the militia, paying

24   the members of a state militia, would appear to me to be an

10:16:39   25   exercise of the spending clause of the Constitution.

The federal government does not pay every member of a state militia.  As noted, the National Guard is only a subset of the state militia, comprised of members who volunteer for dual-enlistment and voluntarily meet the other standards requirement for recognition, federally, as part of the National Guard.

There remains other parts of the state militia. There is the undifferentiated militia -- or the unorganized militia, rather -- and then there's also another subset of the militia that is organized but is not part of the National Guard.  I believe that's referred to, federally, as part of a state force.  In Texas, it's the Texas State Guard.  And I believe, in Alaska, it's the Alaska State Defense Force.

So that is my background understanding of the relevant constitutional authorities and the relevant law. I'll say a word more about my tentative thoughts on how that bears on the issue but allow you to correct me as to my understanding of the background law.

The militia clauses of the Constitution were designed to strike a balance between a number of different interests.  On the one hand, supplementing the federal fighting forces, which many of the framers were wary of a standing army and envisioned a smaller role for a federal professional fighting force, so there was a need to create mechanisms by which the federal government could ensure that

1    militia in the various states were ready to join the national

2    defense force when called to that duty.  So there was a need

3    for federal standards of discipline, would be the

4    constitutional term, as well as providing federal arms and

10:18:44  5    organization to ensure ready integration of a militia into

6    the national fighting force.

7              There was a competing concern with having standing

8    armies and loyalty to the federal rulers, and part of the

9    compromise in the militia clause was allowing the states to

10:19:04  10   appoint the officers of militia and to govern the militia

11   when not called into federal service, so that, even though

12   the standards under which the state was governing its militia

13   were set forth -- could be set by Congress as part of the

14   federal discipline, the personnel and the execution of those

10:19:24  15   standards would be selected by the state as a measure

16   intended to create bonds of loyalty with states and not just

17   to national rulers.

18             Nothing in the Constitution requires the federal

19   government to arm a state militia.  Congress is empowered to

10:19:44  20   do so, but nothing requires Congress to do so.  Nothing in

21   the Constitution requires Congress to fund any portion of the

22   exercises of a state militia, to pay any member of a state

23   militia for their service as such, to provide any funds for a

24   state militia to run as such.  Congress is empowered to do so

10:20:08  25   by the spending clause as to payments, but nothing requires

1    Congress to do so.

2          So the protections of the division of authority in

3    the second militia clause of Article I were intended to

4    balance those interests, but nothing requires Congress to

10:20:32  5    provide any funding at all for a state militia.  Nothing in

6    the Constitution.

7          So, in this case, as I had mentioned, most states

8    have a militia that includes a subset recognized as part of

9    the National Guard; and, because of the dualness regime that

10:20:55  10   those members volunteered for, are also members of the

11   National Guard of the United States.

12         Congress has delegated to the President the power

13   to set standards of discipline and to organize the National

14   Guard.  That's Title 32, United States Code Section 110, I

10:21:18  15   believe.  The President has claimed to exercise that

16   authority here.  Well, I believe the President's also claimed

17   to exercise all constitutional authority, including under the

18   spending clause, to either spend money or put conditions on

19   its spending of money for the support of that subset of the

10:21:43  20   militia.

21         But no one is arguing and no one's disputing that

22   the federal government has not ordered all members of a state

23   militia to receive COVID-19 vaccinations.  The order applies

24   only to that subset of the members of the militia who had

10:22:02  25   joined a unit that is voluntarily meeting federal standards

1    of discipline and organization in exchange for receiving a

2    voluntary federal commitment to provide pay, funding,

3    retirement benefits, arms, things that the government may

4    optionally provide.

10:22:25    5    So, based on that structure, the defendants argue

6    that the consequences from members of the National Guard

7    subject to the vaccination mandate at issue for

8    non-compliance are, essentially, a withdrawal or withholding

9    of different forms of federal benefits that Congress is not

10:22:52   10   required to afford in the first place and is thus allowed to

11   place conditions on, those benefits being pay, recognition,

12   the consequence of which is eligibility for retirement

13   benefits, points towards retirement, and retirement credit.

14   And I think that plaintiffs' response to that is

10:23:26   15   that withholding pay from an individual guardsman, as opposed

16   to a National Guard unit, is the relevant constitutional

17   distinction, and that withholding federal pay from an

18   individual guardsman, under the National Guard system, would

19   cross the line into governance of a state militia within the

10:23:56   20   meaning of Article I, Section 8, Clause 16.  Whereas,

21   withholding pay from a National Guard unit, I think the

22   plaintiffs concede that would be fine.  That would be

23   constitutional, at least.

24   Okay.  So I've put that on the table, my reading of

10:24:11   25   the Constitution, the statutes, and the parties' positions in

1    this case.

2            Plaintiff, this is your motion, so let me give you

3    a chance to open, present your high-level case, and then also

4    correct me or point out any modifications to my understanding

10:24:30    5    of the case and the arguments.

6            MR. HILTON:  Thank you, Your Honor.  I think I

7    agree with everything you just outlined.  Could not have and

8    was not going to say it better myself.  So very few quibbles

9    with what Your Honor outlined.

10:24:47    10           I think it's important to begin with what is the

11    authority that the defendants have to withhold this funding

12    and how do they go about it?  That, to us, is what the case

13    is really all about.

14           The case is not about whether the President can and

10:25:01    15    the federal government can set readiness requirements for

16    National Guard members.  Of course it can, under 32 USC

17    Section 110.  And it's not about whether consequences can

18    flow from failure to meet those readiness requirements.

19    Absolutely, they can.

10:25:19    20           But Congress has been very clear about how the

21    defendants in this case have to go about imposing those

22    consequences.  What defendants have done here is ignore the

23    tools that are available to them; and, instead, without

24    having -- without being in charge of these forces, because

10:25:38    25    they haven't been federalized, they've attempted to order

1    them directly to receive the vaccine and attempted to order

2    that specific punishments at specific times will be incurred

3    for failure to do so.  That's not one of the tools available

4    to the defendants to achieve their goals here.

10:25:58    5         Our position is that there are three basic tools

6    that the defendants have here to achieve compliance with

7    their readiness requirement with the COVID vaccine.  They can

8    withdraw consent to participate in active guard reserve duty.

9    They can withdraw federal recognition, which, as Your Honor

10:26:17   10   pointed out, that's what entitles these guardsmen to pay, and

11   to benefits, and to retirement points.

12        And then there's 32 USC Section 108, which provides

13   for the withholding of funds from a state and a state's

14   National Guard.

10:26:32   15        With respect to withdrawing consent, they have done

16   that, and that relates to active guard and reserve service.

17   It does not relate, however, to drill status.  The withdrawal

18   of consent is limited to only active guard and reserve

19   service -- status, rather.  So that is not what's at issue

10:26:57   20   here.  What's at issue here is regular drill status for the

21   vast majority of national guardsmen, which is what we think

22   of when we think of the National Guard, one week a month, two

23   weeks a year, participating in that.  So that withdrawal and

24   consent does not affect drill status under federal law.

10:27:13   25        With respect to withdrawal of recognition,

defendants have not taken that step, and I think they've at

least indicated that they don't intend to or at least don't

want to.  They've acknowledged that that's a long process; it

can take months.  There are many procedural protections and

10:27:33  requirements that they must go through, and they have not

gone through that process.

Now, if they were to go through that process and

withdraw recognition from an individual guardsman, which they

can, then I think the consequences that would flow from that

10:27:45  would look very similar to what we have called the

enforcement memoranda.  But they haven't gone through that

process.  They haven't done that.

So they're left with 32 USC Section 108, and that

is -- the wording of that statute is important because it

10:27:59  doesn't talk about individual guardsmen.  It talks about the

state and the National Guard of that state.  It says the

President may withhold money, in whole or in part, based on

the timelines that the President prescribes, and it doesn't

talk about doing that with respect to individual guardsmen.

10:28:18  The United States has argued in briefing before

many courts, for years, that this is the sole available

remedy to them in cases where the administrator of the

governance of the National Guard on a day-to-day basis is at

issue, which it is with the readiness requirement.  And

10:28:36  they've argued again and again they should not be held

1  responsible over day-to-day decisions regarding individual

2  guardsmen.

3          We quote some of that briefing -- and I don't

4  believe defendants try to walk away from it or respond to

10:28:46  5  it -- on page 13 of our motion.

6          The United States put it well in a brief to the

7  DC Circuit, December 9, 2009:  If a state National Guard

8  fails to comply with the regulation or orders issued pursuant

9  to 32 USC Section 110 -- which is what we are talking about

10:29:06  10  here -- then the federal government has only one remedy, to

11  withhold funds under 32 USC Section 108.

12          So I think we all agree about the tool box and what

13  is available to defendants.

14          Now, what defendants -- they also purport to have

10:29:25  15  invoked Section 108 in their documents, but what they've

16  actually done here can't be squared with the text of 108 and

17  in the way in which they've described it in their own

18  briefing and the way that that reads.

19          Section 108 relates to the state as a whole.  If

10:29:40  20  the state -- if the federal government is not happy with how

21  the state is running its National Guard and governing it,

22  they can withhold funds.  As you say, they're not required to

23  fund, or train, or anything like that.

24          So the specific actions that they've dictated here

10:29:54  25  are important.  They announced a vaccination requirement on

1   August 24, 2021.  It wasn't until November 30th that the

2   requirement came out from the secretary of defense that

3   Title 32 guardsmen can't participate in drills or training or

4   other duty, that they will have their paychecks withheld,

10:30:14   5   that there won't be credit for excused absences, but that

6   ended with "specific policies will be forthcoming."  And so

7   it wasn't clear exactly what was going to happen.

8         Then, December 7, the secretary of the Air Force

9   issues some specific guidance.  Sets a deadline for the end

10:30:32   10   of December, giving guardsmen very little notice, and saying

11   that they'll be able to withdraw their consent for active

12   guard and service status, and saying they won't be able to

13   participate in drills and training, and even going so far as

14   to order recoupment, taking money out of individual

10:30:49   15   guardsmen's pockets for any unearned or special incentives.

16         The Department of Army issued similar orders on

17   December 14, 2021.

18         On December 16th, Governor Abbott sent a letter to

19   the secretary of defense, and we didn't get a response until

10:31:06   20   after filing this lawsuit on January 27th.

21         So, again, the question in this case is not whether

22   defendants have to pay this money, whether or not there are

23   consequences for Governor Abbott's order not to impose a

24   vaccination mandate, but defendants have to go about it in

10:31:22   25   the right way.  They cannot -- President Biden can't hide

1   behind Secretary Austin.  He can't commandeer Governor Abbott

2   or Governor Dunleavy.

3           He has to own this decision, either by federalizing

4   the National Guard and ordering the vaccination himself or by

10:31:37   5   going through the -- using the approved tools that Congress

6   has laid out for him to use.  And he has to own that decision

7   with all the accompanying political and pecuniary costs.  He

8   hasn't done that; and, therefore, he can't inflict these

9   specific and detailed punishments that the enforcement

10:31:55   10   memoranda provide.

11          And one area where I would just add a little bit of

12   expansion to the background considerations that Your Honor

13   very eloquently laid out.  When we're talking about the

14   fundamental compromise of the militia clauses and the

10:32:09   15   structure that the framers set out, something that was very

16   important to them, was who can inflict punishment.

17          They were very concerned that a centralized federal

18   government in charge of punishment and in charge of these

19   specific and detailed consequences for failure to follow an

10:32:29   20   order or failure to meet a requirement, that that could be

21   used as a tool of oppression and effectively undermine state

22   militias.

23          Because of that, it's extremely important that,

24   when the chain of command is with the states -- which it is

10:32:42   25   right now.  Because these guardsmen we're talking about have

1   not been federalized -- that that punishment comes from their

2   commanders-in-chief, which are the governors of Texas and

3   Alaska.

4           So I went on a little bit longer than I intended,

10:32:55   5   but I hope I've answered your questions in there.  I'm happy

6   to continue to run through the rest of our case or answer any

7   specific questions, however you'd like me to proceed.

8           THE COURT:  Sure.  Under the relevant memoranda,

9   what are all the consequences to a member of the -- let's say

10:33:12   10   the Texas National Guard, to use an example here, for failing

11   to receive the COVID-19 vaccination?

12           It's withholding of pay; right?

13           MR. HILTON:  That's correct.

14           THE COURT:  Denial of credit for retirement

10:33:31   15   purposes.  And also a denial of an excused absence from the

16   training from which they are excluded, which would ultimately

17   have the effect of making that person ineligible for service

18   as part of the National Guard as defined in 32 USC Section

19   101 as being recognized under federal standards.  Is that

10:34:10   20   right?

21           MR. HILTON:  My understanding is that if, because

22   of the no-excused-absences component of this, if a guardsman

23   were to miss three weekends, three of his monthly

24   obligations, at that point he'd automatically proceed to be

10:34:37   25   discharged.

1      THE COURT:  And so what's your best authority that

2  withholding of pay and eligibility for benefits is outside

3  the scope of Section 108 of Title 32, which concerns the

4  National Guard being barred, in whole or in part, from

10:35:03   5  receiving money or any other aid, benefit, or privilege?

6      I mean, I think the defendants are arguing that

7  denial of pay and of other access to the conditions to get

8  recognition federally and federal money would qualify as the

9  President -- or as the denial, in part, to the National Guard

10:35:37  10  of money, aid, or benefit in the sense that the National

11  Guard is made up of its members, and each member is part of

12  the National Guard; so denying pay to an individual guardsman

13  is denying pay, in part, to the National Guard of the state.

14      What's your best authority to otherwise?

10:36:00  15      MR. HILTON:  So, Your Honor, I don't know that I

16  have a case for you exactly on that point, but let me lay out

17  why I think their reading of this is incorrect.

18      And I agree with you that, essentially, their

19  argument is this is a denial, in part, of funding.

10:36:20  20      To begin, this can't be squared with the text of

21  Section 108.  Section 108 talks about a state failing to

22  comply with a requirement of this title, it does not talk

23  about an individual guardsman failing to comply with the

24  requirement of this title.

10:36:34  25      So defendants would be perfectly within their

1  rights to say:  Governor Abbott, as long as your Order GA 39

2  stands, you're not complying within this title, and we're

3  going to reduce, as a top-line matter, the funds that we

4  provide to the state of Texas an amount of money equivalent

10:36:51  5  to, you know, your percentage of unvaccinated guardsmen.

6  That's our position for how 108 should operate.

7  So that's one problem, is they're addressing the

8  wrong violation, or, rather, the wrong violator.  Here, their

9  quibble should be with Governor Abbott.  Instead, they're

10:37:13  10  going after individual guardsmen.  They have no leverage to

11  fight back, and there's no negotiating power.  And an

12  individual guardsman is powerless in the face of that.

13  Whereas, if they were to follow the procedure of

14  Section 108 and alert the state that it's failing to comply

10:37:32  15  with the requirement of this title, as they should have, then

16  that would be a decision for the President.  And he could

17  certainly make that, but then it would be clear that he is

18  defunding the Texas National Guard and not going after

19  individual guardsmen.

10:37:49  20  It is his responsibility for withholding this money

21  or any other aid, or benefit, or privilege, in whole or in

22  part, not the responsibility of the individual guardsmen for

23  failing to comply for the readiness requirement.

24  Our supporting evidence to our motion for

10:38:04  25  preliminary injunction makes clear -- I think this is from,

1   actually, General Norris -- that this is an unprecedented way

2   of dealing with a vaccination requirement.  This is

3   usually -- readiness requirements like this are handled at

4   the unit commander level.  This is not something that has, at

10:38:22   5   least to our knowledge, ever been something that's a federal

6   policy saying, you will be discharged if you don't have X

7   vaccine by X date and pay withheld.  And part of the reason

8   why we don't have an authority squarely addressing this issue

9   is because this is the first time they've tried to do

10:38:38   10   something like this.

11          The other point I would make about this, Your

12   Honor, in addition to going after the wrong target -- if they

13   do want to go after the target of an individual guardsman,

14   then they are using the wrong process.  They have that

10:38:52   15   process detailed for them by Congress, and that's the

16   withdrawal of federal recognition.  And they've explained in

17   their papers that that process takes months, that that's not

18   something that they've done.

19          They have withdrawn consent for active guard and

10:39:06   20   reserve status.  But as Your Honor correctly noted, the

21   federal recognition is what establishes the entitlement to

22   pay, benefits, and retirement credits, and on and on.  Until

23   that recognition is withdrawn, those individual guardsmen are

24   entitled to pay.  It's as simple as that.  And Section 108

10:39:27   25   doesn't alter that conclusion.

1        The requirement -- and in order to make all of

2   these determinations, Title 32 USC Section 105 provides the

3   vehicle for defendants to do that.  They can go out and do

4   inspections of guardsmen, or units, or of the entire state.

10:39:46   5   They haven't gone through that process either.  They've

6   simply decreed that anyone who is not vaccinated is going to

7   have their pay withheld.

8        And, you know, the requirement here is for the

9   State to certify that it's ready to meet any needs that the

10:40:00   10   federal government may have, and that's not what they've

11   targeted.  They've targeted the individual guardsmen who

12   haven't chosen to get the vaccine.  They've chosen to put

13   their lives on the line for their country, but they haven't

14   chosen to get the vaccine.  And now defendants have targeted

10:40:16   15   them, as opposed to targeting the State and Governor Abbott,

16   who is the real and appropriate target under Section 108.

17        So that would be my response to what I agree is

18   their primary contention, that this is a withholding, in

19   part, of funds under 108.

10:40:31   20        THE COURT:  Right.  I'm looking at General Norris's

21   declaration, which is Exhibit 7 to your motion for

22   preliminary injunction, Docket Number 25-7.

23        And, on page 3, paragraph 12, General Norris

24   indicates that, in the November 30th memo, the secretary of

10:41:02   25   defense prohibited unvaccinated guardsmen from participating

1    in Title 32 paid status.

2           So it appears that the parties agree that the

3    consequence is pay to the guardsmen.  That's the primary

4    consequence, pay in the form of current pay, pay in the form

10:41:24    5    of getting credit for future retirement pay or for retirement

6    benefits that have monetary value, insurance, that sort of

7    thing.

8           MR. HILTON:  That's right.  That's the

9    November 30th letter from the secretary of defense.  That's

10:41:35   10    Exhibit 4 to our motion.  And that did not, itself, set out

11    any timelines or specifics.  Those were forthcoming at that

12    point.  But that is where that requirement was put out

13    there.

14           THE COURT:  Is there any other -- and I'm looking

10:41:47   15    at that provision, but I'm asking is there any other part of

16    this declaration or other evidence that shows another

17    consequence to a member of a National Guard of a state

18    specifically court-martial and restriction of liberty,

19    imprisonment, confinement?  Or is the consequence solely in

10:42:10   20    the general category of withholding of certain benefits, or

21    pecuniary remuneration, or, potentially, recoupment of pay?

22           Is there any liberty interest that could be

23    withdrawn or impinged upon for violation of the COVID

24    vaccination readiness standard?  And, if so, where is that in

10:42:38   25    the evidence?

1          MR. HILTON:  Not that I'm aware of, as such, within

2     the enforcement memoranda.

3          So, as far as where are the requirements, I think

4     there is an argument that protected liberty interests are

10:42:50  5     being invaded by guardsmen being put to this choice, but I

6     want to go through the specifics of what they're asking for

7     first.

8          Within General Norris's declaration, this general

9     section is what, you know, in her declaration describes the

10:43:04  10     requirements.  I think paragraph 19 of this declaration is

11     particularly noteworthy because that describes the follow-on

12     order by the Department of the Army.  So the December 7th

13     order, for example, only relates to the Air National Guard,

14     but the requirements for the Army order from the

10:43:24  15     December 14th order are in paragraph 19.

16          That order itself is not an exhibit to our motion

17     because there was concerns about whether that could actually

18     be filed in the public record or whether it was classified in

19     some degree, so it's described here.

10:43:37  20          But with respect to the specific requirements that

21     are in the enforcement memoranda that are in the record, we

22     have the November 30th letter, which outlines:  Can't

23     participate in drills, training, or duty; no DoD funding may

24     be allocated for payment of duties under Title 32 for

10:43:55  25     unvaccinated guardsmen; and no credit or excused absences if

1   you missed drill because of your vaccination status.

2         On December 7th, the secretary of the Air Force

3   withdrew consent for active guard and reserve status -- he

4   was permitted to do that; that is a consequence -- set the

10:44:17   5   December 31st deadline and put out that recoupment

6   requirement, which, again, is taking money out of the pockets

7   of guardsmen.

8         And then there is one other requirement, and I

9   apologize, but I can't find the spot.  There is a consequence

10:44:36   10   of something about flagging the guardsman's file, that they

11   won't be eligible for certain promotions or positions.  I

12   think that's part of the argument --

13         THE COURT:  That's paragraph 18.  It's the page

14   before.

10:44:54   15         MR. HILTON:  Thank you, Your Honor.  That's exactly

16   right.

17         So, as such, the enforcement memoranda don't

18   threaten imprisonment; they don't threaten court-martial or

19   anything like that.  They just merely threaten the

10:45:10   20   livelihoods of national guardsmen, which is, I think, no less

21   serious.

22         THE COURT:  The federal livelihood.  I mean, they

23   could always become part of the state defense force.

24         MR. HILTON:  Of course.  Of course.

10:45:23   25         But what I would note is that, throughout these

1   federal vaccine cases, we've seen -- particularly from the

2   Fifth Circuit -- a recognition that, when you're putting

3   someone to the choice of choosing between getting the shot or

4   not getting the shot, for whatever reason, and their

10:45:42   5   livelihoods, that is implicating a very serious interest that

6   is worthy of concern to the federal courts.

7          In particular, there's a United Airlines case -- it

8   was in the employment context -- that came out not too long

9   ago.  But, there, they found that being forced to choose

10:45:57   10   between getting a vaccine over a religious objection and

11   being terminated was, itself, irreparable injury, as opposed

12   to merely an economic injury, because it implicated that

13   fundamental  First Amendment right to your religious beliefs.

14          THE COURT:  I'm focusing now back on Section 108,

10:46:19   15   which I think is pretty pivotal to the dispute.

16          If there was a federal -- this is a hypothetical.

17   If there was a federal standard that said that every member

18   of the National Guard shall be up to some sort of standard

19   that shows their readiness to kill in action, in combat, and

10:46:55   20   the governor of a state excused 5 percent of the National

21   Guard from being prepared to kill, saying that we don't think

22   that it's vitally important for them if they have a

23   conscientious objection to killing, your argument under

24   Section 108 is that the President would have to withhold

10:47:29   25   money from the entire National Guard of that state as opposed

1  to just withholding federal pay for the 5 percent who were

2  not meeting the federal readiness standards of being able to

3  kill?  Is that where your theory would come down on that

4  hypothetical set of facts?

10:47:50  5  MR. HILTON:  Yes and no.  Under Section 108, I

6  think that's correct.  But through the process that Congress

7  has laid out of withdrawal recognition, certainly the federal

8  government can do that, and that would have the

9  individualized consequences based on failure to meet whatever

10:48:08  10  requirement as long as they go through that procedure.

11  THE COURT:  Okay.  And so, under that reading of

12  just the 108 authority, the President could say this National

13  Guard unit's funding is reduced by 5 percent, which is the

14  same percentage of its members who are not up to federal

10:48:34  15  readiness standards of being able to kill in combat.

16  Is that correct?  They could do a partial

17  reduction, but it has to be as to the whole guard unit?

18  MR. HILTON:  That's right.  And then that would put

19  the onus on the commander in chief of that particular

10:48:53  20  National Guard to figure out what to do about that, and maybe

21  they make up that funding gap with state funding if those

22  people still have federal recognition.  It would depend on

23  the specifics of that hypothetical.

24  THE COURT:  So, for that theory to work, there has

10:49:14  25  to be sort of a bright-line conceptual distinction between

1    the National Guard of that state, which is the language in

2    Section 108, and the members -- the people who collectively

3    comprise the National Guard of that state; right?

4         Is there something in federal law in the

10:50:03  5    definitional section -- I mean, I'm focusing on this really

6    in-depth here as we discuss it -- but is there something in

7    the definitional section that makes that bright distinction,

8    or could the National Guard be understood as simply the

9    collection of its members?

10:50:06  10         MR. HILTON:  I'm going to ask my colleague, Lief

11   Olson, to try and find the definitional cite that you're

12   asking for.

13         What I'll say first is that, with respect to 108,

14   you know, the specific language here is instructive.  This is

10:50:21  15   talking about a state's failure to comply with the

16   requirement in this title, not about the National Guard's

17   failure to comply, not about a unit's failure to comply.  It

18   is talking about the state's failure to comply.

19         THE COURT:  Right.

10:50:34  20         MR. HILTON:  So, here, certainly, a readiness

21   requirement or a regulation of setting forth the discipline

22   under Section 110, that's an obligation on the state to do

23   that training in accordance with the discipline set forth by

24   Congress, which has delegated that to the President.  Failure

10:50:51  25   to comply with that certainly could be grounds for

1    withdrawing funding, but that is the State's failure.  That

2    is not an individual guardsman's failure, or it's not one

3    member of the State's failure.  It is the whole State's

4    failure, and the buck stops with the commander-in-chief.  So

10:51:08    5    that is what Section 108 is really geared to.

6            And I'll also just note, you know, we're -- and I

7    apologize.

8            I've got -- I think the definitional section that

9    Your Honor is asking about is 32 USC Section 101(a)(3), I

10:51:33    10   believe.  No.  Excuse me.

11           THE COURT:  Right.  National Guard -- that reads:

12   National Guard means the Army National Guard and the Air

13   National Guard.

14           And then (a)(4) -- well, there's no A, it's just

10:51:48    15   4 -- reads:  Army National Guard means that part of the

16   organized militia of the several states and territories,

17   Puerto Rico, and the District of Columbia, active and

18   inactive, that -- and then it goes on to set forth the

19   requirements.

10:52:10    20           So the National Guard is the entity.  It's defined

21   as part of the militia of the several states.  So, if the

22   militia is of the states, there's at least an argument that,

23   if a member of the militia is not in compliance with the

24   federal discipline, that means that, because it's a militia

10:52:37    25   of the state, that the State is not in compliance with the

1    federal discipline; right?

2              What do you make of that argument?

3              MR. HILTON:  I could certainly see that argument

4    where, if the State is not in compliance if its members are

10:52:51  5    not in compliance, that noncompliance would flow up from the

6    National Guard members to the State.

7              But, again, that would still be the State's failure

8    under that reading; and, certainly, as it interacts with 108.

9              THE COURT:  Then I guess my other question is, just

10:53:13  10   to make sure I'm understanding, that these are all --

11   assuming that this is statutorily authorized, which is what

12   we've been discussing about Section 108, if it were

13   statutorily authorized, then, from a constitutional

14   perspective, these all fall into the category of conditions

10:53:38  15   on federal spending; right?

16             Because they're not -- I think we've agreed that

17   these memos don't restrict the liberty of a militia member,

18   but what they do do is set the conditions under which some

19   subset of the militia can volunteer to be part of this more

10:54:02  20   limited class of militia members who get federal pay, federal

21   funding as part of what's called the National Guard.  Which,

22   the federal government does have authority under the spending

23   clause to put conditions on its spending.  But what it

24   doesn't have the authority to do, at least outside of

10:54:26  25   federalizing a militia, is to govern them.

1      But the consequences of this order are not

2  applicable outside of the National Guard, right?  It's not

3  applicable to a defense force or to you and me as part of

4  able-bodied men within a certain age who live in this state,

10:54:49   5  and therefore part of the -- I think it's called the

6  unorganized militia.

7      Right?  Is that right?

8      MR. HILTON:  Yeah, that's correct.

9      And with respect to the spending clause, certainly,

10:54:59  10  again, we're not disputing that the defendants have no

11  obligation to pay for National Guard training or units or

12  members who they don't wish to pay for.  I think they have

13  that authority.

14      But when we talk about the spending clause, of

10:55:14  15  course, that's Congress's authority, and Congress has made

16  very clear how the spending on national guardsmen should

17  proceed.  If you are recognized, then you receive pay.  If

18  you're not recognized, then you don't receive pay.

19      And Congress was clear that the way to withhold pay

10:55:36  20  from an individual guardsman, as opposed to a state, for

21  failure to comply under Section 108 is to withdraw

22  recognition.  And, again, the defendants don't dispute and I

23  think have no intention of going down that road of

24  withdrawing recognition.  And, perhaps they may, but they

10:55:53  25  haven't yet.  And I think, if they were to do that, that

1   would be entirely consistent with what we're arguing.  I

2   think they would have the authority do that.

3            THE COURT:  As to the irreparable injury, it did

4   seem like  you had made out a pretty good case that some

10:56:13   5   percentage of your attrition -- a pretty good case that some

6   percentage of your force would rather retire from the

7   National Guard entirely than stay on under the vaccination

8   requirement and that that attrition would -- some percentage

9   of that attrition, at least, would be in excess of what you

10:56:39   10   might call organic attrition or preexisting attrition.

11            Do you have any sense, of those individuals who

12   left the National Guard on account of this requirement, what

13   percentage would join the state defense force?  I think it's

14   called the Texas State Guard.

10:56:59   15            And then the similar question for Alaska, the

16   Alaska Defense Force, I think.

17            MR. HILTON:  I don't know the answer with respect

18   to Alaska.

19            With respect to Texas, I don't have the number for

10:57:09   20   you.

21            The Texas State Guard is a volunteer force,

22   primarily, is my understanding, and it doesn't have that

23   honor and authority of also serving in the National Guard of

24   the United States.

10:57:25   25            So we've made that argument, that they can't really

1    be thought of as one-to-one substitutes of each other because

2    there are additional benefits and honors that go along with

3    being a member of the National Guard of the United States.

4    Of course there are.

10:57:39    5            As far as what percentage would have considered

6    were those facts different, I don't think we have that

7    information.  But I will say that, the harm of members

8    leaving due to this requirement, that has already been

9    occurring.  It is certain to occur.  And it's, I think,

10:57:59   10    unrebutted by defendants that that will occur.

11            The primary factual rebuttal they make to the issue

12    of attrition and reduction in forces is that, well, the

13    amount of attrition as a result of this is going to be

14    consistent with the normal organic attrition, as Your Honor

10:58:15   15    calls it.  I think that's a good term for it.  But what

16    defendants don't grapple with is that that's going to be on

17    top of whatever attrition occurs for other reasons.

18            They also don't respond or grapple with the

19    unrebutted testimony from our declarants that explains the

10:58:34   20    immense cost in terms of time and money and loss of

21    experience that will necessarily come with attrition of this

22    kind.  So my view would be that the factual, real-world,

23    on-the-ground harm, as I would call it, is largely undisputed

24    by defendants.

10:58:56   25            There's also another type of harm, I think, that is

really, for lack of a better term, a legal harm, and that's

the injury to the plaintiffs themselves and their command

authority.  So if their right to command their forces in

non-federalized status is being impinged, and accountability

is unclear, and their forces are being put in this impossible

situation with competing orders, that itself is its own

injury.  It's primarily a legal injury to the chain of

command, but it has real-world effects.  And it's the duty of

these plaintiffs to safeguard that authority for future

commanders-in-chief of their state forces.

So I would say there's really two types of injury.

I don't think, if our -- if our legal theory is correct,

there -- you know, that there's a question that there would

be a legal injury.  And, with respect to the factual

boots-on-the-ground injury, again, I think that evidence is,

largely, unrebutted.

I'll also add that defendants go to great lengths

to -- I'll also add that defendants go to great lengths to

discuss COVID, to discuss the effectiveness of the vaccine,

the impact of the vaccine, the reasons why it was a readiness

requirement.  To a certain extent, none of that is really at

issue before the Court.  We're, largely, not disputing any of

that.  And our Administrative Procedure Act challenge doesn't

hinge on those determinations and those considerations.

When we are talking in terms of our APA challenge,

the things that they ignore are things like the effect of
this requirement on these states who are going to have high
attrition in response to a COVID vaccine.  How is the federal
government and the State National Guard, as partners, how are
they going to deal with that, the reliance interests of the
states in being able to govern the day-to-day administration
of their forces, and having that upset for the first time, as
far as we can tell.

So when we're talking about injuries, I really
think most of the evidence is unrebutted and hinges primarily
on whether our legal theory is correct under the
likelihood-of-success factor.

THE COURT:  Very good.  Thank you, Mr. Hilton.

Mr. Avallone, will you be presenting on behalf of
the defendants?

MR. AVALLONE:  Yes, Your Honor.

THE COURT:  Let me start you off at the same place
I started Mr. Hilton off, which is if you have anything to
say about my exposition of the relevant constitutional
provisions and statutory provisions, as well as the relevant
executive actions here and how they all relate to each other.

A couple of reminders about my questions or
reflections.  I do understand, and I think the federal
government agrees -- this is at page 1 of its opposition to
the motion -- that for National Guard members who -- for

National Guard members, as such -- the ones who have not been
activated, right?  Because, remember, they leave their
National Guard status once they are activated.  That the
federal government's authority to set the medical readiness
standards comes from US Constitution Article I, Section 8,
Clauses 15 through 16.  That's the authority that you cite
and say that the authority comes from.  Which is another way
of saying that until the National Guard members are
activated, and, as such, cease to be in the National Guard
and become part of the active service in the Armed Forces,
the federal government's authority does not come from the
President's Article II power over the Armed Forces; correct?
It comes from Congress's power over the militia, which has
been delegated to the President in Section 110.  Is that
correct?

        MR. AVALLONE:  Your Honor, I --

        THE COURT:  That's what you say.  I just want to
make sure I'm stating it correctly.

        MR. AVALLONE:  That is correct.

        THE COURT:  And that's fine.  I don't know that
that bears terribly, other than ruling out a potentially
really broad theory that I didn't understand you to be
arguing, but I just wanted to make sure.

        So, then, as to Congress's power, which has been
delegated to the President in Title 32, the federal

```
 1   government's relying on the militia clauses, and, of course,
 2   the spending clause; right?  Which has been discussed
 3   repeatedly as this is -- you're arguing this is just a
 4   funding condition; correct?
 5           MR. AVALLONE:  That's correct, Your Honor.
 6           THE COURT:  Let me just backtrack one moment to the
 7   last question I asked.
 8           Are there federal reserve units of the United
 9   States Armed Forces other than the National Guard?
10           MR. AVALLONE:  Yes, Your Honor.  There's the Army
11   National Guard, the -- or sorry -- the Army Reserves, the
12   Navy Reserves.  There are many other -- each individual
13   service has other reserve components that are not part of the
14   National Guard.
15           THE COURT:  Okay.  And the authority of the federal
16   government to impose rules for those, conditions on their
17   pay, that authority stems from Congress's power to establish
18   the Armed Forces under Article I and the President's Article
19   II power as commander-in-chief under the Armed Forces;
20   correct?
21           MR. AVALLONE:  That is correct, Your Honor.
22           THE COURT:  But, as to the reserve units that are
23   the National Guard, that power comes from the militia
24   clauses, the spending clause as to Congress, and then the
25   President's power over the militia when activated under
```

Timestamps: 11:04:05 (5), 11:04:21 (10), 11:04:34 (15), 11:04:55 (20), 11:05:05 (25)

1    Article II; is that correct?

2              MR. AVALLONE:  Correct, Your Honor.

3              THE COURT:  I just want to make sure I understand

4    the lay of the land.

11:05:18   5          So plaintiffs' main argument is that -- as to

6    authority, as opposed to arbitrary and capricious -- seems to

7    come down to the way in which the order to receive the COVID

8    vaccination is enforced.  And I guess, in a sense, that's

9    what the analysis of any order comes down to, because what is

11:05:47  10   an order but for the ability to enforce it.  So the ability

11   to enforce that you're relying on here is 32 US Code Section

12   108.

13             What do you say about the plaintiffs' point that

14   the trigger for the withholding of benefits under that

11:06:08  15   statute is that a state fails to comply with the requirement

16   of this title or a regulation under this title, and that the

17   non-compliance here is not by a state but by an individual

18   member of a National Guard of a state?

19             MR. AVALLONE:  So I think it might be helpful to go

11:06:31  20   back to the constitutional text we were looking at before.

21   Specifically, Clause 16.  And I think the key here is going

22   to be the very last portion of Clause 16, where it reserved

23   to the state respectively, the appointment of the officers

24   and the authority of training the militia -- and this is the

11:06:48  25   important part -- according to the discipline prescribed by

1   Congress.

2          And where the current statutory framework sits on

3   that clause is that Title 32 training and duty is, as we

4   discussed, under the direction of the state but needs to be

11:07:10   5   according to the discipline prescribed by Congress.

6          And the second kind of factual issue that I wanted

7   to point out is that Title 32 duty is not paid for by the

8   state.  It's not paid for through a pass-through.  It is paid

9   directly by the Department of Defense.  And we talked about

11:07:32  10   it in our briefs, it's the defense financial and accounting

11   services.

12          So, while we do discuss the spending clause, that's

13   actually in reference to another enforcement -- another part

14   of the -- what the plaintiffs are calling the enforcement

11:07:48  15   memos where the secretary of defense has indicated that there

16   should be no Department of Defense spending for service of

17   unvaccinated or folks that don't meet that requirement.

18          So I think it's a little bit different.  So, for

19   the individuals, it comes down to can you participate in

11:08:08  20   Title 32?  And under the Constitution, Congress gets to set

21   the discipline.  And, as we all agree, the requirement to be

22   vaccinated against COVID-19 is one of many, many federal

23   requirements necessary, and it's founded in the discipline.

24   And that's why, if you don't meet that requirement, you

11:08:31  25   cannot participate in Title 32.

1    So it's not necessarily withholding pay.  It is

2  saying can you participate and earn those benefits.

3    THE COURT:  And so I'm focused a little more in

4  this question on the plaintiffs' statutory authority

11:08:55  5  argument.  The plaintiffs make an argument of lack of

6  constitutional authority, but then they also have an argument

7  of lack of statutory authority.

8    And the point that I was discussing this morning at

9  the most length, I believe, with Mr. Hilton was, what's the

11:09:11  10  scope of this statutory authority under Section 108 for the

11  National Guard of a state to be barred, in whole or part,

12  from receiving money or any other paid benefit or privilege;

13  and does that authority include the enforcement mechanisms,

14  if you will, or the conditions on receiving benefits in the

11:09:40  15  challenge memoranda here?

16    And one of Mr. Hilton's points was that the trigger

17  for this forfeiture of federal benefits in Section 108 is a

18  failure by the state -- it says if a state fails to comply.

19  There's an open interpretation question about what does that

11:10:02  20  mean, a state?  Is militia part of a state for purposes of

21  this clause?  If so, are individual militia members part of

22  the militia, which is part of the stated purposes of this

23  clause?

24    I didn't see any authority cited really either way

11:10:24  25  on that question, but do you have anything you want to call

1   to my attention on that point or authority to present?

2          MR. AVALLONE:  So I think that the key part here is

3   the authority -- and, once again, the second half, where it

4   discusses that the National Guard of that state is barred, in

11:10:42   5   whole or in part.  As Your Honor mentioned, that's extremely

6   broad language.

7          And, also, it doesn't direct the withholding of

8   payments to the state.  It authorizes the President to

9   withhold from the National Guard of that state as its

11:11:01  10   entirety or in part, and that could be whatever subpart.  It

11   doesn't limit it to units or individuals.  Or, you know, if

12   they're not buying the correct type of helmet, the President

13   can say:  You're not buying the correct helmets.  If you

14   don't buy the correct ones, we're not going to pay for them.

11:11:20  15   It is -- that, in part, is key.

16          THE COURT:  So your argument is that the statute's

17   recognition that the National Guard can be barred in whole or

18   part sort of implicitly recognizes that the Guard component

19   of the state has different parts, and that a part of that can

11:11:44  20   fail to comply in the same way that a part could be barred

21   from receiving money.

22          And I see the textual point.  I am just wondering

23   if you have any cases or other authority outside of just the

24   textual point from the language of the statute?

11:12:03  25          MR. AVALLONE:  Your Honor, I do not have anything

1   additional on that particular point.

2          THE COURT:  It's a case of first impression, I

3   suppose, on that point.

4          What do you understand as the difference between a

11:12:18   5   punishment of a guard member -- now I'm moving to the

6   constitutional argument about the fact that governance is

7   reserved to the state as to militia members that are not

8   federalized.  What do you understand as the distinction

9   between governance and punishment and merely setting the

11:12:42   10   standards of discipline?

11          MR. AVALLONE:  So, Your Honor, I think a good way

12   to approach that question is to look at what's been happening

13   historically.  And, if you look at every single state, there

14   is a uniform code for military justice, and there's a federal

11:13:00   15   code for military justice.

16          And when folks are in federal service, if there is

17   a consequence, then it goes to the federal system.  If

18   somebody, for example, is in state active duty while they're

19   in the National Guard, and there is something that comes up

11:13:18   20   that needs to be addressed, that is addressed through the

21   state's processes.  And those are usually -- those are laid

22   out by each state, usually by the state's legislatures, et

23   cetera.  We actually cite to quite a few provisions of

24   Texas's and Alaska's governance provisions.

11:13:41   25          And one key part here is that, at least for Texas

1    and Alaska, they make clear that the governance cannot

2    conflict with federal law and regulations.  So, even if there

3    was a governance argument there -- and we don't believe that

4    there is.  We believe that each step of the enforcement

11:14:04   5    memoranda can be traced back to statutory authority going

6    back to the constitutional authority, and so there is no room

7    for a viable Tenth Amendment governance argument.

8            But even if there were, because those -- the state

9    statutes place a limit on the authority, the governance

11:14:24  10   authority, if there were to be a conflict, that should also

11   be dispositive.  But that's really where we see the

12   difference between those two.

13           And, also, when they are in their different

14   statuses.  So, as a commander-in-chief, can you tell a

11:14:43  15   particular unit to go here, go there, to engage them to the

16   operation?  Those are, traditionally, what has been seen as

17   governance.

18           THE COURT:  As a matter of constitutional

19   authority, do the defendants concede that, as to members of a

11:15:07  20   state militia who are not currently called into federal

21   service, that the limitation of Congress governing those

22   militia members would prohibit Congress from imposing -- from

23   enforcing orders through court-martials; and, ultimately,

24   restrictions of liberty, such as confinement?

11:15:45  25           In other words, as to non-federalized militia

1   members, even though I understand that defendants maintain

2   that they have authority to impose funding restrictions,

3   because it is federal money, do the defendants acknowledge

4   that the limitations of the second militia clause would

11:16:15  5   prohibit enforcement of orders through incarceration?

6           MR. AVALLONE:  Well, Your Honor, I want to make a

7   couple of distinctions, because you mentioned the

8   non-federalized militia, and we had talked a little bit

9   about, this morning, how that label of militia can fall into

11:16:31  10  three different pools:  The unregulated militia, it could

11  also mean the state militia, and it can also mean the

12  National Guard.

13          So I'm assuming --

14          THE COURT:  And I'm just -- I'm sorry to interrupt

11:16:42  15  you.  I'm just talking about the constitutional argument.

16          For the constitutional purposes, the National Guard

17  isn't a thing.  That's a statutory creation.  For

18  constitutional purposes, the object of inquiry is the

19  militia; right?  I mean, there's no mention of a National

11:17:00  20  Guard in the Constitution.  It's called a militia.

21          So I'm just asking, for constitutional purposes,

22  could -- you agree -- you're arguing that Congress's and the

23  President's power as to a state militia that's not called

24  into active service, it does include the power to set forth

11:17:20  25  the conditions on funding that militia.

1    I mean, after all, Congress isn't required to give

2    that militia any funding in the Constitution.  So, when

3    Congress does choose to exercise its spending clause

4    authority and its authority to arm a militia, it's allowed to

11:17:38  5    create conditions and say, well, you have to -- to get this

6    money, you have to comply with these conditions.

7            MR. AVALLONE:  Right.

8            THE COURT:  I understand that point.

9            I'm just trying to understand, is that the limit of

11:17:48  10    your argument?  And asking, so you are conceding, right, as

11    to those non-federalized members of the militia, the

12    Constitution would not allow Congress or the President to put

13    them through a court-martial and put them in jail for failing

14    to comply with the discipline imposed by Congress?

11:18:07  15            The consequence of failing to comply with the

16    discipline imposed by Congress is you don't get Congress's

17    money; you don't get federal money.  The consequence is not

18    and, constitutionally, cannot be you put a member of the

19    militia in jail; is that correct?

11:18:24  20            MR. AVALLONE:  So, Your Honor, you are pushing me

21    to the limits of the intricacies of National Guard procedure,

22    but it's my understanding that --

23            THE COURT:  Well, again, I'm not -- you said

24    National Guard.  I'm talking, just as a constitutional

11:18:36  25    matter, about what does the Constitution say.

1         But go ahead.  Go ahead.

2         MR. AVALLONE:  So I think it's helpful to have the

3    concrete example to kind of see how these all -- how they

4    divide and shake out.  If there is an individual who is not

11:18:51  5    a -- not federalized but is in the National Guard, it's my

6    understanding that there can be -- in the federal military

7    can initiate court-martial proceedings so long as it is done

8    under the state's court-martial regime.

9         And so there can be -- and that's why I want to

11:19:13  10   make sure and parse that all out, because it is possible for

11   the federal government to initiate court-martial proceedings

12   under the state's laws.

13        Given the nuances there, I'm not sure it's happened

14   very frequently.  But it's my understanding that that is

11:19:33  15   something that is possible.

16        THE COURT:  Well, but if the punishment's being

17   imposed in a state court-martial regime, then the punishment

18   is being imposed by the State.

19        MR. AVALLONE:  Correct.

11:19:48  20        THE COURT:  And maybe the federal government is,

21   essentially, the complainant filing a complaint, but it's not

22   the one actually imposing a punishment, right?

23        MR. AVALLONE:  That's correct, Your Honor.

24        THE COURT:  Okay.  So, at least as I understand

11:19:59  25   what you're saying, that's not punishment by a federal

1  official.  Maybe they're instigating the complaint process,

2  but they're not actually imposing the punishment.

3  　　　　　MR. AVALLONE:  I think that's fair.

4  　　　　　THE COURT:  Okay.  And so, essentially, I think

11:20:17  5  you're agreeing, or at least you don't have any data point to

6  the contrary, that, as a constitutional matter, the power to

7  incarcerate a member of a state militia for failing to obey

8  an order belongs to -- at least, when that militia member is

9  not called into active service, belongs to members of -- to

11:20:44  10  the appropriate governing authority under state law, the

11  state court-martial regime or the state governor, whatever

12  the state's law provides.  Is that correct?

13  　　　　　MR. AVALLONE:  I believe that's correct, Your

14  Honor.

11:20:56  15  　　　　　THE COURT:  And is there anything about the

16  executive orders here that would allow for a federal official

17  to order a state militia member into jail for failing to get

18  the COVID-19 vaccination as failure to obey an order?

19  　　　　　MR. AVALLONE:  In the enforcement memorandum, as

11:21:23  20  listed out there as the consequences, that is not one of the

21  consequences that's listed there.

22  　　　　　THE COURT:  Is there anything in the other residue

23  of federal law that would interplay with the enforcement

24  memoranda and allow a federal official to put a state militia

11:21:40  25  member who is not in active federal service in jail for

1  insubordination on account of failing to get the COVID

2  vaccination?

3          MR. AVALLONE:  Your Honor, I'm not aware of any.

4          THE COURT:  I didn't see it either, but I just

11:21:55  5  wanted -- you know, you're an officer of the court, and you,

6  presumably, know this area of law better than me.  And so

7  I'll rely on that representation unless I see contrary

8  evidence, and I don't think the plaintiffs have shown me any

9  either.

11:22:10  10         Why don't you take this opportunity to go ahead and

11  respond to plaintiffs' other points and present any other

12  argument you have this morning.

13         MR. AVALLONE:  Sure.  I thought it just might be

14  helpful, because there were so many documents in the

11:22:38  15  enforcement memoranda, to kind of walk through each of them

16  and trace back exactly the statutory and constitutional

17  authority for what's in each one.

18         And the plaintiffs have identified five documents

19  that they have -- they call the enforcement memoranda.

11:22:51  20         The first one is an August 24th memo, and that's

21  found at ECF Number 25-1.  And that's a memo from the

22  secretary of defense that established vaccination against

23  COVID-19 as mandatory for all armed services, including the

24  National Guard, and directed the secretaries to require

11:23:15  25  vaccinations.

1          And the authority for that additional requirement

2    goes back to the Constitution, Article I, Section 8,

3    Clause 16, as it relates to the National Guard, and which

4    tasks Congress with setting discipline for the militia, and

11:23:34    5    32 USC Section 110, which delegates that authority to the

6    President.

7          And, as we mentioned in our brief, the secretary of

8    defense exercises the President's authority when it comes to

9    these sorts of matters, and that's been recognized by the

11:23:51   10    Supreme Court for quite a long time.  So that's the first

11    memorandum, August 24.

12          The second memo is from September 14, and this one

13    does not appear to be filed on the docket but it's described

14    in the amended complaint, paragraph 59.  And, there, that was

11:24:13   15    the secretary of the Army ordering COVID-19 vaccination and

16    set the requirement.

17          And, once again, that goes back -- for the National

18    Guard folks, goes back to Article I, Section 8, Clause 16,

19    and that's the authority to set discipline.  And, for the

11:24:35   20    secretary of the Army, he's authorized by statute, and that

21    statute is 10 USC Section 10202(a).  And that is Congress

22    delegating the authority to issue regulations for reserve

23    components like the National Guard so long as it's at the

24    direction of the secretary of defense.  If you go back to the

11:25:00   25    memo beforehand, the secretary of defense had ordered the

1   secretary of the Army to do that.

2          The third enforcement memo is from November 30, and

3   that is a secretary of defense memo clarifying and

4   emphasizing that the vaccination is a requirement for members

11:25:19   5   of the National Guard and the Ready Reserve.  That just

6   reiterated the requirement, and it's authorized by the same

7   authority we just talked about.

8          What that also did is it set out three consequences

9   for failure to meet that requirement.  And the first one is

11:25:37   10   that an individual must be vaccinated in order to participate

11   in drills, training, or other duties conducted under Title 32

12   US Code.

13          And, as we talked about, that can be traced back to

14   the Constitution, which allows states to direct training so

11:25:55   15   long as it complies with the discipline that was prescribed

16   by Congress.

17          The second consequence is that no Department of

18   Defense funding may be allocated for payment of duties under

19   Title 32 for members of the National Guard who do not comply

11:26:18   20   with DoD COVID-19 vaccination requirements.  And, as we

21   talked about this morning, that goes to the spending power,

22   and this is a direction to a subagency within the Department

23   of Defense as to who to give money to.

24          And then the third consequence is there will be no

11:26:35   25   credit or excused absences for members who do not participate

1   in drills, training, or other duty for failure to be fully

2   vaccinated against COVID-19.

3          And, once again, that can get traced back to the

4   Constitution where the states are allowed to conduct the

11:26:52   5   training so long as it is according to the discipline

6   prescribed by Congress.  Congress delegated that authority to

7   the President, and the secretary of defense exercises that

8   authority.

9          THE COURT:  And do any of these three consequences

11:27:06   10   go beyond the consequences for members of the National Guard

11   who do not receive the other vaccines required by federal

12   officials?  The eight other vaccines, I believe, like flu

13   vaccine, do any of these consequences in this memo go beyond

14   the consequences for failing to receive one of the other

11:27:31   15   eight required vaccines?

16          MR. AVALLONE:  If I understand Your Honor's

17   question correctly, is the COVID vaccine treated differently

18   than the other vaccines?

19          THE COURT:  Right.

11:27:41   20          MR. AVALLONE:  Under the standards, it is -- if you

21   do not meet medical readiness, you're not qualified to

22   participate in Title 32 training.  That is not unique to

23   COVID-19.

24          You can even -- and some of this is in the Bradley

11:27:59   25   declaration, which is in ECF Number 33-2 in paragraph 4.

1    And, there, he talks about how members must be up to date

2    with their medical readiness health assessments.  Even dental

3    assessments.  So, if you don't go to the dentist and haven't

4    taken care of your cavities, you also may not be eligible to

11:28:23  5    participate in Title 32 training.

6         THE COURT:  You will have your funding for those

7    duties withheld, and you'll not receive credit or excused

8    absence due to failure to receive the flu vaccine, for

9    instance?

11:28:40  10        MR. AVALLONE:  That's under the Department of

11   Defense Instruction 1215.13.  And that sets the requirements

12   for participating in the reserve, which includes the National

13   Guard.

14        So, yes, if you have not completed your health

11:28:57  15   assessments, which include vaccinations, then you're not

16   eligible to participate in Title 32, and that would not be an

17   excused absence.

18        THE COURT:  Okay.  Go ahead.

19        This is Memo Number 3.

11:29:08  20        MR. AVALLONE:  So then we move on to Memo Number 4,

21   which is the December 7 memorandum from the secretary of the

22   Air Force, and that's filed at ECF Number 25-5, Attachment 2.

23   That discusses the Air National Guard.

24        The secretary there confirms the requirement to

11:29:24  25   receive the vaccination.  Once again, we've talked about the

1    Constitution and statutory authority there.  It's the same

2    Article I, Section 8, Clause 16, the authority to set

3    discipline.  And, since this is the secretary of the Air

4    Force, the statutory authority is 10 USC Section 10202(a),

11:29:44   5    and that's specific to the secretaries of each -- for the Air

6    Force or the Army.

7            The secretary of the Air Force withdrew consent for

8    members who are not fully vaccinated to be placed on active

9    guard and reserve orders.  Plaintiffs do not contest that the

11:30:03   10   secretary had that authority.

11           That also set the deadlines to initiate the

12   vaccination regimen and said thereafter those who had not

13   initiated by December 31 could not participate in drills,

14   training, or other duty conducted under Title 10 or 32.  And,

11:30:21   15   once again, that's the same authority going back to the

16   Constitution to set discipline.

17           And then the fifth enforcement memo, December 14 --

18           THE COURT:  I'm sorry.  On Memo 4, this memo was

19   not specific to the Air National Guard; was it?  It also

11:30:41   20   included non-National Guard members of the Air Force?

21           MR. AVALLONE:  Yes, Your Honor.  At Attachment 2,

22   that's what's specifically discussed, the consequences for

23   the folks that are in the Air National Guard.

24           The fifth and final enforcement memo was for

11:30:58   25   December 14.  I don't believe that there's a copy in the

1    record, but it's described in Amended Complaint 60.  And,

2    once again, it's the same consequences as the Air Force,

3    withdrew consent for the active guard and reserve duty and

4    then said that the folks could not -- who did not meet that

11:31:18   5    federal requirement could not participate in Title 32

6    training.

7              And so those are the enforcement orders.  And so,

8    with each of those consequences, if we can trace those back

9    through statute to the Constitution, then there is no viable

11:31:37   10   Tenth Amendment claim.

11             And the plaintiffs had described their Tenth

12   Amendment claim as the governing argument and -- because, if

13   you take a look at Clause 16, there is an explicit delegation

14   of authority to the states which is to the appointment of

11:32:07   15   officers and the authority for training according to the

16   discipline prescribed by Congress, but it was not explicitly

17   delegated for the governing aspect.  So the path for that

18   particular claim goes through the Tenth Amendment.

19             And as the Supreme Court explained, the appropriate

11:32:24   20   way to analyze the Tenth Amendment argument is for the Court

21   to look to see whether the federal government had the power

22   to take the challenged actions; and, if so, there cannot be a

23   Tenth Amendment violation.

24             And so -- in some of their briefing, plaintiffs had

11:32:46   25   taken the idea that what was reserved as a governing power

1    could somehow restrict the explicitly delegated powers.  That

2    flips the Tenth Amendment analysis on its head, and it's not

3    really the right way to be looking at it.

4              THE COURT:  Do you care to respond, present any

11:33:18  5    oral argument in response to plaintiffs' APA argument under

6    the arbitrary and capricious clause about the relevant

7    defendants' failure to consider the full range of relevant

8    considerations in entering these five memoranda?

9              The plaintiffs argue that consideration was

11:33:47  10   obviously given to readiness to incorporate federally, but

11   there wasn't express consideration of other relevant factors,

12   such as bodily integrity or religious liberty.

13             Do you care to respond to that point?

14             MR. AVALLONE:  Well, Your Honor, in terms of bodily

11:34:04  15   integrity and religious liberty, the military has a system

16   set out for folks that have religious objections.  They can

17   submit a request.  It goes through a process.  And they can

18   also bring those claims individually in court, and many folks

19   have.

11:34:21  20             So, in terms of the -- and, to be clear, plaintiffs

21   here have not brought a religious liberty claim.  And I don't

22   believe they have standing to do so because they are --

23             THE COURT:  Right.  No.  I'm aware of the other

24   cases where the individual members are arguing that the

11:34:38  25   process affords them relief they haven't received.

1          MR. AVALLONE:  In terms of arbitrary and

2     capricious, the entire point of the National Guard -- and

3     take a look at the Constitution and at the Federalist Papers

4     that describe why we set up the organized militia.  The point

11:35:01  5     is to prepare for a unified federal national defense.

6          And so, while there may be residual benefits to the

7     states for maintaining National Guards -- and the states here

8     obviously would prefer to have funding that comes from these

9     additional individuals, but the point of the National Guard

11:35:31 10     is to prepare folks -- like the Texas National Guard, which

11     has a history of heroism, particularly World War II.  They

12     were on the beachheads in Italy, the first division of

13     Americans on continental Europe, fought through Southern

14     France and took the fight all the way to the Nazi's homeland.

11:35:52 15          These are heroes.  And the reason they were able to

16     integrate seamlessly into the federal forces is because there

17     was uniform standards.  And so it is not arbitrary and

18     capricious for the United States military to take those

19     considerations of force readiness and have those be paramount

11:36:16 20     when deciding whether or not to add new requirements.

21          And then, in terms of the irreparable harm, first,

22     I just want to emphasize that plaintiffs must show

23     irreparable harm in order to get a preliminary injunction.

24     There seemed to be some questions in the brief whether or not

11:36:37 25     they showed that, and the case law clearly says that they

1    must.

2              And, here, the enforcement memorandums, they have

3    restrictions on Title 10 and Title 32 duties.  They do not

4    restrict the ability for the Texas National Guard and the

11:36:55    5    Alaska National Guard to have their folks on state active

6    duty, and state duty is paid for by the state.  And while the

7    state may use federal equipment, they pay the federal

8    government to use that.

9              And so the bottom line is that the vaccination

11:37:12   10    requirement will have no impact on operations like Operation

11    Lone Star, which the Texas National Guard participates in

12    state active duty, paid for by the residents of Texas under

13    the exclusive direction of the governor.

14             And the second reason why that's not irreparable

11:37:37   15    harm, Your Honor -- we discussed it a little bit earlier

16    today -- was that both states maintain a state guard, and

17    members of the state guard are not entitled to pay allowances

18    or medical care or funds from the United States.  Those are

19    entirely paid for by the states, and the states are free to

11:38:00   20    hire as many as folks as they'd like into those state guards.

21             The other theory of irreparable harm was the

22    interference with the governor's authority.  And just first,

23    to be clear, it's not even clear that there is a conflict

24    between what plaintiffs are calling the enforcement memoranda

11:38:23   25    and the challenge or the orders that are identified by

1    plaintiffs, because the enforcement memoranda apply to

2    federal officials and direct federal officials to take

3    certain actions.  They do not ask state officials to take

4    actions in their state capacities.

11:38:40   5        But even if there was a conflict between both

6    governors' executive orders and federal law or regulations,

7    the state statutes make clear that federal law and

8    regulations prevail.  And we've listed all that out in our

9    briefing.

11:38:58  10        Just to give you an example, Texas Government Code,

11   annotated, Section 437.004, says the governor can issue

12   regulations, quote:  According to existing federal and state

13   law, end quote.  And that's related to governing the National

14   Guard.

11:39:17  15        Alaska has similar requirements that the Alaska's

16   adjutant general and governor may issue regulations but only

17   if the matters are, quote, not otherwise provided for by the

18   laws of the United States or regulations adopted by the

19   President.  And that's Alaska Statute Section 26.05.340(d).

11:39:44  20        So, even if there were a conflict between the

21   governor's executive orders and federal law, the state law

22   would have restricted those orders, and their lawful exercise

23   of their authority would not have been impinged.

24        And, finally, the public interest.  And when the

11:40:05  25   government opposes a preliminary injunction, the factors of

1    balance of equities and public interest merge.  And, to be

2    clear, it would be in the public interest to ensure that

3    every member of the Texas and Alaska National Guards remain

4    ready for federal service.

11:40:22  5         Defendants' strong interest is ensuring that the

6    folks that are in those National Guards are ready for federal

7    service should the call come out that they are needed to

8    defend their nation.

9         The public also has a strong interest in ensuring

11:40:42  10   that the Armed Forces, including the National Guards, are fit

11   and healthy.

12         Justice Kavanaugh had a concurrence in

13   *Austin versus Navy Seals 1-26*, where he described, quote:

14   Sending ships into combat without maximizing the crew's odds

11:40:58  15   of success, which -- such as would be the case with ship

16   deficiencies in ordnance, radar, working weapons, or the

17   means to reliably accomplish the mission, is dereliction of

18   duty.  The same applies to ordering unvaccinated personnel

19   into an environment in which they endanger their lives, the

11:41:17  20   lives of others, and compromise the accomplishment of

21   essential missions.

22         And I thought that summed it up quite nicely as to

23   why the public has an interest in this.

24         And the -- finally, the public interest in equities

11:41:31  25   support that the federal government and the taxpayers from

1    across the nation only pay for training of individuals who

2    are ready for federal service.  That's the purpose of the

3    National Guard, to prepare for federal service.

4              And if we're asking other states to pitch in on the

11:41:50    5    federal level, it should be for training for individuals who

6    are ready to serve at a federal level.

7              And principles of federalism also support denying

8    the preliminary injunction.  The Constitution, which we've

9    talked about quite a bit today, sets out the respective

11:42:08    10   responsibilities for federal and state officers, and the

11   power to set the vaccination requirements squarely fits

12   within the enumerated powers.  And allowing a state to rely

13   on implied reserve powers to restrict and block the exercise

14   of explicitly enumerated powers would turn federalism on its

11:42:32    15   head, and such a result would not be in the public interest.

16             And so, Your Honor, for all those reasons, we would

17   ask that you deny the motion for preliminary injunction.

18             THE COURT:  Very well.  Thank you.

19             Mr. Robison, I haven't given you a chance to speak.

11:42:49    20   I know Alaska's scheme differs somewhat from Texas's scheme

21   but appears similar in many of the relevant regards.

22             Is there anything that you want to add or call to

23   my attention as I consider your motion in support of the

24   other briefing?

11:43:08    25             MR. ROBISON:  Yeah.  I'm not sure I could do any

1   better than Mr. Hilton did, Your Honor.  I would at least

2   respond to the Court's question about do guardsmen in Alaska

3   have an interest in joining the state defense force if

4   they're unable to serve in the guard.

11:43:20   5          I, like Mr. Hilton, don't have any specific numbers

6   on that.  My sense is no.

7          Also, just to be frank with the Court -- and I'm

8   sure you've noticed -- we don't have a declaration from our

9   adjutant, so we're relying on the legal harm argument to show

11:43:36   10   irreparable harm.

11          THE COURT:  Right.  And I noticed that Alaska's

12   scheme seems to have three components of its organized

13   militia.  I think Texas, essentially, has two.  It's got --

14   the Texas National Guard, which has an Army and Air Force

11:43:54   15   component.  And then the Alaska regime, I think, had three,

16   as I was reading the statutes.  It has the Alaska National

17   Guard with Army and Air Force components, the Alaska Defense

18   Force, and then the Alaska Navy.

19          Did I recall that correctly?

11:44:12   20          MR. ROBISON:  Yeah.  I believe that's correct.

21          THE COURT:  The Naval Guard or Naval Reserve,

22   something like that.

23          I'm curious about it, but does that play any legal

24   role in the dispute here, or is the dispute just with the

11:44:25   25   Alaska National Guard?

1      MR. ROBISON:  I don't think it factors into the

2  legal questions here.  And, frankly, I don't think it's a

3  large component of our force.

4      THE COURT:  Does Texas have a Texas State Navy?  Do

11:44:37   5  you know?

6      MR. HILTON:  Unfortunately not, Your Honor.

7      THE COURT:  I vaguely recall being at a ceremony

8  where someone was awarded an honorary Texas Navy degree, but

9  I think that was a joke.  I'm not sure.

11:44:49  10      MR. OLSON:  Your Honor, as one of the people who

11  has respectfully requested that the governor confer a rank of

12  admiral of the Texas Navy upon at least two people, I have to

13  object to the characterization as a joke.

14      THE COURT:  Okay.  Okay.  It was a conferral

11:45:02  15  without legal status.

16      MR. OLSON:  An honorific, perhaps.

17      THE COURT:  An honorific, there we go.

18      MR. OLSON:  Okay.

19      THE COURT:  Maybe that's what I'm thinking.

11:45:08  20  Admiral of the Texas Navy, an honorific without legal

21  consequence.  At least, consequence here.

22      Okay.  Very good.

23      So, Mr. Hilton, let me turn back to you for any

24  reply.  And, specifically, with regard to the question of

11:45:27  25  punishment, was anything you heard from the defendants

1   requiring correction or clarification?

2              I'm focused right now on the issue of imposing jail

3   time.  Could any member of the Texas National Guard who is

4   not in active federal service be put in jail by a federal

11:45:50   5   official for failing to get the COVID vaccine as

6   insubordination?  And, if so, what authorities would show

7   that -- legal authorities would show that ability?

8              MR. HILTON:  My understanding is no.  The

9   enforcement memoranda don't refer to it, and I have no reason

11:46:06   10  to dispute.

11             And I would just add the caveat that, perhaps,

12  if -- I understand this to be a readiness requirement.

13  Perhaps there could be a version of events where somebody is

14  directly disobeying an order, and there may be a

11:46:22   15  contempt-like standard where just the deliberate disobedience

16  could eventually lead to that and the operations of some

17  other means.  But our claims don't rest on that, and we're

18  not making that an allegation.

19             THE COURT:  And, also, I didn't see in the

11:46:33   20  complaint or motion, but just to be clear, there's not an

21  unconstitutional conditions claim here by the plaintiffs;

22  right?  Essentially, a spending clause claim.

23             This is a claim of lack of authority under the

24  militia clauses, under Article II's reservation -- limitation

11:46:54   25  on the President's commander-in-chief authority as to the

1   militia.

2          But it's, essentially, a militia authority claim as

3   to the constitutional statute, correct?

4          MR. HILTON:  That's correct.  And, you know, I

11:47:07   5   think our statutory claims proceed from the premise that

6   defendants could accomplish these objectives if they had used

7   the methods that Congress has prescribed.

8          Because they have not done so, they can't take a

9   shortcut to achieving by indirect means what they have not

11:47:24  10   achieved by withdrawal of recognition or the other things.

11          THE COURT:  And also, to clarify my understanding,

12   if a member of the Texas National Guard refused to get the

13   flu vaccine or one of the other eight required vaccines, your

14   legal argument would also mean that the Department of Defense

11:47:51  15   could not withhold pay or participation in drills on account

16   of refusal to get the flu vaccine, or any other vaccine;

17   right?

18          There's nothing specific to the COVID vaccine as

19   opposed to other vaccines?

11:48:05  20          MR. HILTON:  As a matter of federal law, that's my

21   understanding, as a matter of federal readiness requirements.

22          Of course, it's a very different matter under state

23   law.  The executive order from Governor Abbott says that no

24   vaccine mandate may be imposed that applies to the Texas

11:48:23  25   Military Department.

1        And to the extent some argument around this is

2   premised on defendants' interpretation of state law, I think

3   the crucial thing that they fail to appreciate is that

4   governor's Executive Order GA-39 has the force and effect of

11:48:36  5   State law pursuant to the Texas Disaster Act, and that's

6   Chapter 14 of the Government Code Section 418.02.

7        So, to the extent that there are State law issues

8   here, our position would be that the governor's order is

9   lawful as a matter of State law.

11:48:56  10       THE COURT:  And then what do you say to

11   Mr. Avallone's point that there is not, strictly speaking, a

12   conflict between the governor's executive order and the five

13   enforcement memoranda because the governor's order applies to

14   governmental entities in Texas, to State governmental

11:49:23  15   entities, and the enforcement memoranda do not require a

16   State official or a State enforcement entity to take any

17   particular action?  The enforcement memoranda, rather, direct

18   withholding the pay and benefits that can be executed by

19   federal officials.

11:49:43  20       Do you agree with that, or do you have any

21   qualifications or context for that point?

22       MR. HILTON:  We don't agree with that, Your Honor.

23   And perhaps as a technical matter of who is the person who

24   the order is directed to, perhaps defendants may be right.

11:49:56  25   But the effect of the orders is that separation proceedings

1  must begin once the failure to get a COVID vaccine is past

2  the deadline.  There is no discretion.  And so, because of

3  that -- you can see this in Exhibit 5, that talks about

4  separation proceedings must begin.  It talks about

11:50:19  5  involuntarily putting someone on the individual Ready

6  Reserve, which has many of the same requirements -- or

7  effects, rather, with respect to pay and benefits.

8          So, for that reason, it's also not an acceptable

9  substitute that these guardsmen could be put on state active

11:50:37  10  duty, because, once someone is not vaccinated by the

11  deadline, the consequence must begin.  The State does not

12  have discretion as a matter of these orders, as least, as we

13  understand them.

14          THE COURT:  Very good.  Anything else you care to

11:50:52  15  reply to?

16          MR. HILTON:  A couple of points, if I may, Your

17  Honor.

18          With respect to the irreparable harm point that

19  counsel raised, saying that there's no impact to the missions

11:51:09  20  because of the availability of state active duty --

21  particularly Operation Lone Star is a state active duty

22  mission -- I believe our declaration from Nick Kidd details

23  that -- or, rather, excuse me -- our declaration from the

24  Texas Department of Public Safety.  That's Rick Martin.

11:51:29  25          That misunderstands the harm slightly.  It's not

1   that there isn't another legal means available to conduct the

2   same mission; it's that the attrition that these unlawful

3   enforcement memoranda will cause will necessarily have

4   impacts on the State that cannot be avoided.  We know that

11:51:49   5   that is going to happen.

6   And the declarations from the Texas Department of

7   Emergency Management and the DPS make clear why the Texas

8   Military Department is so crucial to many of the State's --

9   many efforts around the state, including Operation Lone Star.

11:52:10  10   I'd also like to highlight something that counsel

11   touched on.  The State Code of Military Justice applies to

12   these guardsmen, not the Federal Code.  And that reminded me

13   of the point Your Honor made earlier, what is an order but

14   the power to enforce it.  That distinction, right there, I

11:52:33  15   think, is central to a lot of the issues running through our

16   complaint.

17   When we're talking about who can govern and when,

18   clearly, the federal government and Congress can govern

19   troops when called into active service.  And, clearly, the

11:52:48  20   President is the commander-in-chief when called into active

21   service.

22   But those are limited, enumerated powers, and they

23   don't provide that authority to govern when not called into

24   actual service.  That absence of -- that lack of granting

11:53:03  25   authority to the federal government makes clear, that must go

68

1    to the state, and that's true as a matter of state law.

2            I'm happy to respond to any other points or answer

3    any other questions, Your Honor.

4            Let me confer with counsel to make sure that he has

11:53:25    5    nothing else.

6            THE COURT:  No?

7            MR. HILTON:  That's all I have, unless you need

8    something from me, Your Honor.

9            THE COURT:  All right.  Thank you.

11:53:31   10            Anything more from defendants, Mr. Avallone?

11            MR. AVALLONE:  No, Your Honor.

12            THE COURT:  Well, let me thank everyone for

13    traveling here and for your diligent preparation for the

14    hearing.  I thought your arguments have been presented

11:53:57   15    professionally and have been very helpful to the Court.

16            The motion will remain under consideration, and

17    court is in recess.

18            [PROCEEDINGS IN RECESS]

19

20

21            OFFICIAL COURT REPORTER'S CERTIFICATE

22

23    I (we) certify that the foregoing is a correct transcript of
      proceedings in the above-entitled matter.

24

25                              /S/ Susan A. Zielie, RMR, FCRR
                                Susan A. Zielie, RMR, FCRR
                                Jund 28, 2022